HARRY J. WILSON AND LUCY WILSON, *ET AL.* (EXCEPT PLAINTIFF, JESSIE A. HOWLAND AND SONS, INC.), PLAINTIFFS-APPELLANTS, v. CITY OF LONG BRANCH, A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

Argued April 22, 1958—Decided June 16, 1958.

366

*Mr. William R. Blair, Jr.,* argued the cause for plaintiffs-appellants (*Messrs. Parsons, Labrecque, Canzona & Combs,* attorneys; *Mr. Theodore D. Parsons* and *Mr. William R. Blair, Jr.,* of counsel).

*Mr. Clarkson S. Fisher* argued the cause for defendant-respondent (*Mr. Edward F. Juska,* of counsel).

*Mr. David D. Furman,* Attorney-General, argued the cause as intervenor.

The opinion of the court was delivered by

FRANCIS, J. On February 15, 1955 the Mayor and Board of Commissioners of the City of Long Branch adopted a resolution pursuant to *N. J. S. A.* 40:55–21.1 *et seq.,* requesting the planning board to make a preliminary investigation and to hold a public hearing for the purpose of determining whether an area of the city referred to therein was blighted. The area, which is located on the portion of the northwestern perimeter of Long Branch fronting on the Shrewsbury River and on a creek flowing into the river, was described as follows:

"Beginning at the intersection of the Shrewsbury River and Branchport Creek; thence eastwardly along the Shrewsbury River to the extension of Manhasset Avenue; thence eastwardly along Manhasset Avenue extended and Manhasset Avenue to Patten Avenue; thence westwardly along Patten Avenue to Florence Avenue; thence southwardly along Florence Avenue to Joline Avenue; thence westwardly along Joline Avenue to the westerly bank of Troutman's

Creek; thence northwardly along the westerly bank of Troutman's Creek to Atlantic Avenue; thence westwardly along Atlantic Avenue to Branchport Creek and along Branchport Creek to the point and place of beginning."

The board undertook the preliminary investigation and conducted public hearings on May 3, 17 and 25, June 8, 22, July 13 and August 2, 1955. On September 8, 1955 it adopted a resolution declaring the area to be blighted within the meaning of the statute. After receiving a copy of the resolution and report and reviewing the entire matter, on October 4, 1955, the board of commissioners approved the determination of blight.

On October 31, 1955, 27 days thereafter, the plaintiffs instituted this action in lieu of prerogative writ in which they sought a judgment that the resolutions of both boards are illegal and void because the Blighted Area Act is unconstitutional (for various reasons to be discussed) and because the proceedings before both bodies were not conducted in accordance with the requirements set forth in the act. The trial court sustained the municipal action and we certified the matter for review on our own motion.

## I.

### The Issue of Constitutionality.

Section 1 of the act, *N. J. S. A.* 40:55-21.1 defines a "blighted area" to mean an area

"wherein there exists any of the conditions hereinafter enumerated:
(a) The generality of buildings used as dwellings or the dwelling accommodations therein are substandard, unsafe, insanitary, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living;
(b) The discontinuance of the use of buildings previously used for manufacturing or industrial purposes, the abandonment of such buildings or the same being allowed to fall into so great a state of disrepair as to be untenantable;
(c) Unimproved vacant land, which has remained so for a period of ten years prior to the determination hereinafter referred to, and which land by reason of its location, or remoteness from developed

sections or portions of such municipality, or lack of means of access to such other parts thereof, or topography, or nature of the soil, is not likely to be developed through the instrumentality of private capital;

(d) Areas (including slum areas), with buildings or improvements which by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community;

(e) A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare."

The legislation provides that if, after certain proceedings have been taken, a portion of a municipality is found to be blighted within that definition, the governing body "may, but shall not be required to, acquire the real property within the area by purchase, or by eminent domain proceedings, and may proceed with the clearance, replanning, development or redevelopment of the area as a public purpose and for public use, or the said governing body may, by resolution, agree that a private corporation may undertake such clearance, replanning, development or redevelopment in accordance with statutory authority and subject to the provisions of *paragraph 1, Section III, Article VIII, of the Constitution."* *N. J. S. A.* 40:55-21.10.

Community redevelopment is a modern facet of municipal government. Soundly planned redevelopment can make the difference between continued stagnation and decline and a resurgence of healthy growth. It provides the means of removing the decadent effect of slums and blight on neighboring property values, of opening up new areas for residence and industry. In recent years, recognition has grown that governing bodies must either plan for the development or redevelopment of urban areas or permit them to become more congested, deteriorated, obsolescent, unhealthy, stagnant, inefficient and costly. As a result, at least 38 states now have remedial legislation similar to that of New Jersey. *Jacobs & Levine, "Redevelopment: Making Misused and*

*Disused Land Available and Usable,"* 8 *Hastings L. J.* 241
(1957). Even if there were no express constitutional sanc-
tion for redevelopment of the type described in our statute,
ample authority to do so might be found in the well of
police power. Manifestly, the purposes to be served are
intimately related to the public health, welfare and safety
and so are consonant with both Federal and State Constitu-
tions. *Berman v. Parker,* 348 *U. S.* 26, 75 *S. Ct.* 98,
99 *L. Ed.* 27 (1954); *Sorbino v. City of New Brunswick,*
43 *N. J. Super.* 554 (*Law Div.* 1957); *Redfern v. Board
of Com'rs of Jersey City,* 137 *N. J. L.* 356 (*E. & A.* 1948);
*Ryan v. Housing Authority of City of Newark,* 125 *N. J. L.*
336 (*Sup. Ct.* 1940); *Romano v. Housing Authority of
City of Newark,* 123 *N. J. L.* 428 (*Sup. Ct.* 1939), affirmed
124 *N. J. L.* 452 (*E. & A.* 1940); Annotation, 44 *A. L. R.*
2d 1414, 1420 (1955). As the former Supreme Court said
in *Mansfield & Swett, Inc., v. Town of West Orange,* 120
*N. J. L.* 145, 150 (*Sup. Ct.* 1938):

"The state possesses the inherent authority—it antedates the Con-
stitution—to resort, in the building and expansion of its community
life, to such measures as may be necessary to secure the essential
common material and moral needs. The public welfare is of prime
importance; and the correlative restrictions upon individual rights—
either of person or of property—are incidents of the social order,
considered a negligible loss compared with the resultant advantages
to the community as a whole. Planning confined to the common
need is inherent in the authority to create the municipality itself.
It is as old as government itself; it is of the very essence of
civilized society. A comprehensive scheme of physical development
is requisite to community efficiency and progress. * * * The
police power of the state may be delegated to the state's municipal
subdivisions created for the administration of local self-government,
to be exerted whenever necessary for the general good and welfare.
It reaches to all the great public needs; * * *."

For an early forward looking expression in a related field,
see *Tide-water Company v. Coster,* 18 *N. J. Eq.* 518 (*E. & A.*
1866).

In the *Berman* case, *supra,* the United States Supreme
Court dealt with the constitutionality of the 1945 Redevelop-
ment Act of the District of Columbia—an act quite similar

in scope to that now before us. Its validity was sustained with a broad expression of the vista of the police power:

"Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. * * * Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.

We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. * * *." 348 *U. S.* at *pages* 32, 33, 75 *S. Ct.* at page 102; compare *Redevelopment Agency of City and County of San Francisco v. Hayes,* 122 *Cal. App.* 2d 777, 800–802, 266 *P.* 2d 105 (*Dist. Ct. App.* 1954), *certiorari* denied 348 *U. S.* 897, 75 *S. Ct.* 214, 99 *L. Ed.* 705 (1954).

Moreover, if there were any doubt at the state level of the compatibility of the statute in question with our organic law, it would be dispelled by the 1947 *Constitution,* which contains specific approval and authorization of redevelopment projects. *Art.* VIII, *Sec.* III, *par.* 1 declares:

"1. The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose aod public use, for which private property may be taken or acquired. Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment, * * *."

Thus we come to the more specific charges of unconstitutionality.

(a)

It is urged that the act violates *Art. IV, Sec. VII, par.* 4, of the 1947 *Constitution,* which demands that every law shall embrace but one object and that shall be expressed in the title. The argument is that the title contains three objects, to wit:

"An Act (1) defining 'blighted area,' (2) authorizing municipalities to determine that areas are blighted areas, and (3) to undertake the clearance, replanning, development and redevelopment of such areas." *L.* 1949, *c.* 187. (Insertions ours)

▮▮▮ The standard prescribed for the title does not require that it contain a resumé of the provisions of the act. Compliance exists when it expresses the general purpose and when all of the provisions of the legislation appear to be in furtherance of that purpose and appropriate to the end expressed. *General Public Loan Corp. v. Director of Div. of Taxation,* 13 *N. J.* 393, 403 (1953). In the present instance (1) the definition, (2) the authorization of municipalities to decide whether a particular area conforms to the definition, and (3) the authorization of municipalities to proceed to clear and redevelop the area are matters integrally related to the single objective, municipal improvement of blighted areas. *State on Information of Dalton· v. Land Clearance for Redevelopment Auth.,* 364 *Mo.* 974, 270 *S. W.* 2d 44, 54 (*Sup. Ct.* 1954). Nor does the fact that section 10, *N. J. S. A.* 40:55–21.10, permits the governing body, by resolution, to agree that a private corporation may undertake such clearance, *etc.,* require a different conclusion. The section does not confer a power which is beyond the orbit of the title. It simply specifies one method by which the municipality may "undertake [the] * * · * redevelopment." No authority is granted directly to a private corporation.

(b)

▮▮▮ The novel argument is presented that prior to actual condemnation, the act permits a taking of property without just compensation in violation of *Art. I, par.* 20, of the

1947 *Constitution.* Plaintiffs point out that *N. J. S. A.* 40:55–21.10 says that after a determination that an area is blighted, the municipality "may, *but shall not be required to* acquire the real property within the area by purchase, or by eminent domain proceedings \* \* \*" and may redevelop it. And they urge that the "very determination of blight in itself constitutes a taking of property" because its market value is thereby lessened or destroyed, and with the threat of condemnation hanging over it, they cannot sell or improve it. In effect, they say that a statute is contrary to our basic law which permits a municipality to impair the value of property and restrict its use by a declaration of blight without requiring compensation for such loss. But this is not a taking in the constitutional sense. It is akin to the result which flows from municipal zoning. If some diminution in market value can be said to follow from a finding of blight inspired by the valid exercise of police power, it is *damnum absque injuria.* As Justice Heher said in *Mansfield & Swett, Inc., v. Town of West Orange, supra:*

"The principle is firmly established in our federal jurisprudence that injury to private property ensuing from governmental action in a proper sphere, reasonably taken for the public good, and for no other purpose, is not necessarily classable as a 'taking' of such property within the intendment of the constitutional guaranties against the deprivation of property without due process of law, or the taking of private property for public use without compensation. \* \* \*

A limitation of private property rights in land to the extent reasonably necessary to meet a public exigency is justifiable under this sovereign power. *Block v. Hirsh*, 256 *U. S.* 135, 41 *S. Ct.* 458, 459, 65 *L. Ed.* 865. Ordinarily, a course of action may be deemed to be in the public interest when it fairly tends to promote the good of the community at large. *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504. And an ulterior public advantage may support 'a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use.' *Noble State Bank v. Haskell*, 219 *U. S.* 104, 31 *S. Ct.* 186, 188, 55 *L. Ed.* 112."

And see: *Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200 (1949).

A similar issue was raised in *Bauman v. Ross,* 167 *U. S.* 548, 17 *S. Ct.* 966, 984, 42 *L. Ed.* 270 (1897). Congress enacted a law "To Provide a Permanent System of Highways in that Part of the District of Columbia Lying Outside of Cities." It directed the formulation of a general plan by the Commissioners of the District for the extension of such highways and for the making and recording of a map showing such plan. And the further provision was made that after the filing of the map, no non-conforming subdivision of any land covered thereby should be admitted to record. An affected land owner charged that by reason of the language of the statute his property was taken without compensation when the map was filed. The United States Supreme Court rejected the claim, saying:

"The recording of the map under section 2 does not constitute a taking of any land, nor in any way interfere with the owner's use and enjoyment thereof. * * * The object of the recording of the map is to give notice to all persons of the system of highways proposed to be established by subsequent proceedings of condemnation. It does not restrict in any way the use of improvement of lands by their owners before the commencement of proceedings for condemnation of lands for such highways, nor does it limit the damages to be awarded in such proceedings. The recording of the map, therefore, did not of itself entitle the owners of lands to any compensation or damages."

And in *Danforth v. United States,* 308 *U. S.* 271, 60 *S. Ct.* 231, 84 *L. Ed.* 240 (1939), the same court, speaking in a similar vein, said:

"* * * Until taking, the condemnor may discontinue or abandon his effort. * * * A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." 308 *U. S.* at *pages* 284, 285, 60 *S. Ct.* at *page* 236.

To the same effect see *Kean v. Union County Park Commission,* 130 *N. J. Eq.* 591 (*E. & A.* 1941); *Zurn v. City of Chicago,* 389 *Ill.* 114, 59 *N. E. 2d* 18, 26 (*Sup. Ct.* 1945).

(c)

■ The State and Federal Constitutions are said to be in conflict with the act because it allegedly permits the taking of property by the municipality for private use, namely, for development by private capital and for the pecuniary profit of private individuals. The allegation stems from the provision of section 10, *N. J. S. A.* 40:55-21.10, to the effect that following the declaration of blight, the governing body may, by resolution, agree that a private corporation may undertake the redevelopment project. This permissive authorization is expressly sanctioned by our 1947 *Constitution, Art.* VIII, *Sec.* III, *par.* 1. As has been indicated, the ultimate taking of the land is clearly for a public use, *i. e.,* elimination of the blight and redevelopment of the area for the welfare of the community as a whole. *Berman v. Parker, supra;* Annotation, 44 *A. L. R. 2d, supra,* at *pages* 1420-1426. The acquisition is not for the use of a private corporation (if one is engaged); rather, such corporation is used to accomplish the public purpose. *Cf. Redfern v. Board of Com'rs of Jersey City, supra.* The private corporation, by its contract to redevelop, represents the means as distinguished from the end itself. And the possibility that some profit may eventuate therefrom does not render the means unlawful. *Papadinis v. City of Somerville,* 331 *Mass.* 627, 121 *N. E. 2d* 714, 717 *(Sup. Jud. Ct.* 1954), and *cf. City of Trenton v. Lenzner,* 16 *N. J.* 465 (1954), *certiorari* denied 348 *U. S.* 872, 75 *S. Ct.* 534, 99 *L. Ed.* 757 (1955). Again the opinion in *Berman v. Parker, supra,* is pertinent:

"Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. * * * The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." At *pages* 33, 34 of 348 *U. S.* at *page* 103 of 75 *S. Ct.*

Cf. State on Information of Dalton v. Land Clearance For
Redevelopment Auth., supra, 270 S. W. 2d 44, at pages 52,
54 (Sup. Ct. 1954); Schenck v. City of Pittsburgh, 364 Pa.
31, 70 A. 2d 612 (Sup. Ct. 1950); Annotation, 172 A. L. R.
966, 968 (1948).

(d)

█ It is alleged that the act discriminates against private
property owners and in favor of public utilities, contrary to
the Fourteenth Amendment of the Federal Constitution, and
Article I, par. 5 of the New Jersey Constitution. The com-
plaint arises from the provisions of section 11, N. J. S. A.
40:55-21.11, which ordains that the governing body shall
determine if retention of the utility property in its existing
location will interfere with the consummation of the re-
development plan. If so, an order shall be made requiring
its removal and relocation, the expense thereof, including any
for land or rights in land, to be a part of the cost of the
municipal project. This is said to be discriminatory because
no such recompense is established for the home owner or for
the owner of a business who must also move his furniture
and equipment following condemnation.

█ But the Legislature may classify different types of
property owners and treat them differently without offending
the fundamental law. The requirement of equal protection
is satisfied if all persons within a class reasonably selected
are treated alike. And a classification is reasonable if it rests
upon some ground of difference having a real and substantial
relation to the basic object of the particular enactment or on
some relevant consideration of public policy. If there is a
reasonable distinction, there is no oppressive discrimination.
The Legislature has a wide range of discretion in this area
and distinctions will be presumed to rest upon a rational basis
if there be any conceivable state of facts which would afford
reasonable support for them. Robson v. Rodriquez, 26 N. J.
517 (1958).

Utilities are necessary adjuncts of the public welfare.
Their business operations and their property have been sub-

ject to special legislative treatment for many years. 43 *Am. Jur., Public Utilities & Services,* § 11. In the present context, uninterrupted service during and after the completion of the redevelopment project is vital. Where removal of the facilities is necessary, it is important that the relocation be as expeditious and as controversy-free as possible. That end is intimately related to the achievement of the overall public purpose and, along with the longtime recognition of the special nature of utilities, justifies the separate treatment prescribed.

(e)

Another challenge to constitutionality is that the act contains no reasonable standards to guide a planning board or governing body in making a determination that an area is blighted. Of course, a delegation of unbridled discretion, to these subordinate agencies, would constitute an abdication of the authority committed to the Legislature by the Constitution. *State by Van Riper v. Traffic Tel. Workers' Fed. of N. J.,* 2 *N. J.* 335 (1949). The boundary lines of the grant of authority are not required to be marked out with mathematical precision. In *Ward v. Scott,* 11 *N. J.* 117, 123 (1952), this court pointed out that "the exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power."

The five subsections of section 1, *supra,* of the act define "blighted area" with substantial exactitude and confine the municipal decision to those limits. The patent purpose is to deal with substantial areas as distinguished from individual properties, and to authorize a declaration of blight when the buildings therein fall within any of the descriptions specified. Without repeating those specifications, we have no hesitancy in finding them to be a sufficient channeling of the local authority.

More general standards were regarded as proper in *Berman v. Parker, supra,* 348 *U. S.* at *page* 35, 75 *S. Ct.* at *page* 103. And see: *Sorbino v. City of New Brunswick, supra,* 43 *N. J.*

*Super.* at *pages* 568, 569; *Gohld Realty Co. v. City of Hartford*, 141 *Conn.* 135, 104 *A. 2d* 365 (*Sup. Ct. Err.* 1954); *State on Information of Dalton v. Land Clearance For Redevelopment Auth., supra,* 270 *S. W. 2d* at *pages* 54–56; *Velishka v. City of Nashua,* 99 *N. H.* 161, 106 *A. 2d* 571, 44 *A. L. R. 2d* 1406 (*Sup. Ct.* 1954); *Opinion to the Governor,* 76 *R. I.* 249, 69 *A. 2d* 531 (*Sup. Ct.* 1949); *Belovsky v. Redevelopment Authority,* 357 *Pa.* 329, 54 *A. 2d* 277, 172 *A. L. R.* 953 (*Sup. Ct.* 1947).

 Specifically, it is argued that the absence of any limitation upon the size of the area which may be designated as blighted and the possibility that sound structures or even a portion of a municipality containing a number of such structures may be included, points to unrestrained delegation of power. We cannot agree. The area to be classed as blighted is the portion of a municipality which in the judgment of the planning board or governing body, as the case may be, reasonably falls within the definition laid down by the Legislature. The fact that such an area includes some sound homes or buildings, or even that incorporated therein as an integral part and necessary to the accomplishment of the redevelopment plan, is a portion of the municipality containing structures which are not substandard, is not sufficient to provoke a judicial pronouncement that the Legislature unreasonably surrendered its prerogatives and duties. And moreover, where as in this instance the guides for the subordinate agency action are adequate, the courts will not interfere with the boundary lines adopted in the absence of palpable abuse of discretion. *City of Newark v. New Jersey Turnpike Authority,* 7 *N. J.* 377, 385 (1951), appeal dismissed 342 *U. S.* 874, 72 *S. Ct.* 168, 96 *L. Ed.* 657 (1951).

Reverting to *Berman v. Parker, supra,* we find that substantially the same issue was presented and adjudicated. Justice Douglas said:

"In the present case, Congress and its authorized agencies attack the problem of the blighted parts of the community on an area rather than on a structure-by-structure basis. That, too, is opposed

by appellants. They maintain that since their building does not imperil health or safety nor contribute to the making of a slum or a blighted area, it cannot be swept into a redevelopment plan by the mere dictum of the Planning Commission or the Commissioners. The particular uses to be made of the land in the project were determined with regard to the needs of the particular community. The experts concluded that if the community were to be healthy, if it were not to revert again to a blighted or slum area, as though possessed of a congenital disease, the area must be planned as a whole. It was not enough, they believed, to remove existing buildings that were insanitary or unsightly. It was important to redesign the whole area so as to eliminate the conditions that cause slums—the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented. * * * Such diversification in future use is plainly relevant to the maintenance of the desired housing standards and therefore within congressional power.

* * * Property may of course be taken for this redevelopment which, standing by itself, is innocuous and unoffending. But we have said enough to indicate that it is the need of the area as a whole which Congress and its agencies are evaluating. If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly. The argument pressed on us is, indeed, a plea to substitute the landowner's standard of the public need for the standard prescribed by Congress. But as we have already stated, community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building.

It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."

To like effect are: *Sorbino v. City of New Brunswick, supra,* 43 *N. J. Super.* at *page* 574; *Kaskel v. Impellitteri,* 306 *N. Y.* 73, 115 *N. E. 2d* 659, 662 (*Ct. App.* 1953), *certiorari* denied 347 *U. S. 934, 74 S. Ct. 629, 98 L. Ed.* 1085 (1954);

*State on Information of Dalton v. Land Clearance For Redevelopment Auth., supra,* 270 *S. W.* 2d at *page* 53; Annotation, 44 *A. L. R.* 2d, *supra,* at *page* 1439. Denial of the right of the municipality to draw within a blighted area certain houses or buildings which are in good condition, would be in some instances to defeat the overall legislative purpose, namely, the redevelopment of blighted *areas.*

(f)

Section 9 requires the institution of an action in lieu of prerogative writ to review a determination of blight within 30 days after final action by the governing body. The pertinent Supreme Court Rule, *R. R.* 4:88–15, fixes 45 days as the period of limitation. This apparent conflict, according to plaintiffs, renders the entire statute invalid. See *Constitution, Art.* VI, *Sec.* V, *par.* 4.

The complaint was filed within 27 days after the adoption of the confirmatory resolution of the governing body. Thus it was within time by both standards and it is not necessary to consider the effect of an actual conflict between them. In any event, such a conflict would not invalidate the entire law. Obviously, the provision for review is separable; if it did not exist, a remedy in the courts could be had under *R. R.* 4:88. Consequently, the plaintiffs' position is not sustainable.

(g)

Finally, plaintiffs urge that because *Art.* VIII, *Sec.* III, *par.* 1 of the Constitution refers to "blighted" areas without defining the word, the authority to do so resides in the judicial and not the legislative branch of the government. This is entirely specious. The article declares that redevelopment of "blighted" areas shall be a public purpose and authorizes the Legislature to empower municipal governments to undertake such redevelopment. Manifestly, the grant of power contemplated development and implementation by the Legislature. Definition of blight was the

ordinary and expected incident of the exercise of that power and no reasonable argument can be made that the connotation ascribed to it overreaches the public purpose sought to be promoted by the Constitution.

## II.

### Procedural Aspects of the Appeal.

#### (a)

As has been indicated, the preliminary investigation of the problem of whether the area in question is blighted was referred to the planning board by resolution of the governing body. Appellants claim that authority to comply with the request could not be conferred on the board in that manner and consequently the entire proceeding before it was *ultra vires.*

The contention is predicated upon section 3 of the Municipal Planning Act of 1953, *N. J. S. A.* 40:55-1.3, which says:

"The governing body may by ordinance grant any of the powers exercisable by a planning board to a planning board * * * created under section four of this act, *but no particular power may be exercised until expressly granted by ordinance* · · * * *." (Emphasis added)

The conceded absence of express bestowal of authority by ordinance to conduct such an investigation at first shrouds the operation of the board in doubt. However, the uncertainty disappears on reference to section 2 of the Blighted Area Act, *N. J. S. A.* 40:55-21.2, which directs that when the governing body passes a resolution for such a preliminary investigation,

"If the municipality has a planning board created by ordinance, pursuant to the provisions of article one of chapter fifty-five of Title 40 of the Revised Statutes, the said resolution *shall* provide that the matter of such preliminary investigation shall be referred to the said planning board, * * *." (Emphasis added)

The Long Branch Planning Board was established on July 6, 1954, under the provisions of the statute cited.

██ ██ These two statutes must be treated as *in pari materia*. Thus, it was not necessary that the power to engage in the preliminary investigation be conferred specifically by ordinance. Such jurisdiction flowed directly and by operation of law to it from section 2 of the Blighted Area Act and existed independently of the ordinance which gave it birth. The point is without substance.

## (b)

### THE HEARING BEFORE THE PLANNING BOARD.

Section 4 of the act, *N. J. S. A.* 40:55–21.4, directs the planning board to "cause a hearing to be held" at a fixed time and place to hear "persons interested in, or who would be affected by, a determination that the area is a blighted area, * * * and who favor or are against such a determination." Public notice of the hearing is required to be published in a newspaper of general circulation in the municipality and a copy thereof must be mailed to the last owner of each parcel of property in the area according to the assessment records. The notice must contain the general boundaries of the area to be investigated, and must state that a map showing such boundaries and the location of the various parcels of property included therein has been prepared and can be inspected at the office of the municipal clerk.

██ ██ The objection is advanced that the public notice employed in this instance contained some additional material not required by the statute and that the proof does not show the preparation and filing of the map mentioned. But the surplus information did not destroy the efficacy of the otherwise satisfactory notice. And the record amply demonstrates the presence of the map in the clerk's office prior to the time of the giving of the notice.

The nature of the hearing is specifically prescribed. The board is required to

"hear all persons interested in the investigation and shall consider any, and all, *written objections* that may be filed and any evidence

which may be adduced in support of the objections, or any opposition to a determination that the area is a blighted area." *N. J. S. A.* 40:55–21.6. (Emphasis added)

Plaintiffs assert that this section confers on them the right to a judicial hearing, that is, one where the proof is formally introduced subject to trial type examination and cross-examination. And they claim that it was prejudicially erroneous for the board to receive reports, maps and documents *ex parte,* and to make their own inspections of the area without specifically stating at open hearing and for the record what their observations disclosed. Further, they urge that it was improper to announce at the hearings that the board had no subpoena power, that persons subpoenaed by plaintiffs did not have to testify unless they wished to do so, and that persons who did make statements did not have to submit to cross-examination. And they insist, finally, that it was error to refuse to require the planning consultant who had prepared the principal report in the case to return for further cross-examination by counsel for certain of the property owners where the hearing adjourned at the end of the particular session before the examination to which he had submitted had been completed.

It will be observed that the function of a planning board is to make a preliminary investigation, to determine if the area studied is blighted, and to report to the governing body. Final decision, both as to the condition of blight and as to whether the property in the area should be taken, rests with the latter body. No authority is given to the board to subpoena or to swear witnesses. They are directed to consider any and all written objections that may be filed. There is no legislative requirement that such persons must appear at the hearing or submit to cross-examination. Hearsay statements which need not be under oath and which are not required to contain information of their own knowledge, must be "consider[ed]." Any conceivable document, map, article or photograph might be incorporated therein.

In this context a distinction must be recognized between a legislative investigation and hearing and a judicial hearing. No adjudication of property rights is called for here nor is there any taking of property involved. There is simply preliminary investigation and report by a subordinate agency of government. These are typical of the legislative process.

The situation is somewhat similar, although not even as proximate in terms of due process requirements, to that presented when a public body undertakes to exercise the right of eminent domain. In such cases, although the issue of whether the property acquisition is for public use is a judicial question, the necessity for the taking and the extent of the area to be taken are legislative matters for which no trial type hearing is required.

In *Ryan v. Housing Authority of City of Newark, supra,* where it was claimed that the decision to take certain property in condemnation proceedings for public housing purposes without hearing was violative of due process, the court said:

"Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as ' the state may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth · Amendment." 125 *N. J. L.* at *page* 341.

Such questions are purely political and are not the subject of judicial inquiry. *Rindge Co. v. Los Angeles County,* 262 *U. S.* 700, 709, 43 *S. Ct.* 689, 67 *L. Ed.* 1186 (1923); *Dayton Coal & Iron Co. v. Cincinnati, N. O. & T. P. R. Co.,* 239 *U. S.* 446, 36 *S. Ct.* 137, 60 *L. Ed.* 375 (1915); *City of Trenton v. Lenzner, supra,* 16 *N. J.* at *page* 473; *Abbotts Dairies v. Armstrong,* 14 *N. J.* 319, 332 (1954); *State Board of Milk Control v. Newark Milk Co.,* 118 *N. J. Eq.* 504, 523 *(E. & A.* 1935); *Zurn v. City of Chicago, supra.*

It seems plain that so far as the investigation of the matter of blight is concerned, the demands of due process did not call for a hearing at all. *David Jeffrey Co. v. City of Milwaukee,* 267 *Wis.* 559, 66 *N. W. 2d* 362, 380 *(Sup. Ct.* 1954); *Robinette v. Chicago Land Clearance Com-*

*mission,* 115 *F. Supp.* 669, 672 (*D. C. Ill.* 1951). That determination might constitutionally have been left for *ex parte* action by the governing body or the planning board. Of course, the Legislature in its discretion may, as was done here, lay down a mandate for a particular type of hearing. In this event, the procedure must be followed. But having in mind the nature of the public use involved and the fact that ordinarily the subject matter of the hearing is within the legislative domain, the language employed should be scrutinized carefully to determine if the lawmakers intended to yield the normal prerogative and function of their branch of the government.

The argument that a trial type hearing was intended is predicated largely upon the direction, in section 6, *supra,* that among other factors, the board "shall consider * * * *any evidence* which may be adduced in support of the objections, * * *." The idea is that the word "evidence" connotes proof conforming to the rules of evidence applicable to a judicial proceeding and submitted through the avenue of direct and cross examination in the formal setting of a trial type hearing. But a doctrinaire formalism cannot be applied in the consideration of a problem like this. The legislative intent can only be gathered by a study of the entire enactment. The significance of the word "evidence" must then be drawn from its position and association in the framework fashioned by the makers.

As has been shown above, investigation or study of the desirability of acquiring private property for public use, as well as the decision to take, are preliminary matters which have always been regarded as legislative in character and not subject to the hearing requirements of due process. If this were not so, government could not function effectively. We must assume that the Legislature, in adopting the Blighted Area Act, knew the state of the law and the difference between a legislative and a judicial hearing. No sound argument can be made that, when the Legislature in writing the section directed the planning board to consider "any, and all, written objections that may be filed," it intended to

limit the proof to facts admissible under the rules of evidence. The very words "any, and all," clearly point away from such a conclusion. The mandate to consider such objections is followed immediately by the crucial language "and [shall consider] any evidence which may be adduced * * *." In context, it would be inconsistent and illogical to say that this clause contemplates a judicial hearing. The embracive word "any" before "evidence" manifests a design to permit the introduction of any factual data or argument which an objector feels bears upon his position and the question to be reported upon by the board. The purpose is to give objecting property owners unlimited and unhampered scope in the presentation of material which they deem to be in support of their opposition. The language fairly breathes such an objective. Note that the board is ordered to consider any and all written *"objections"* and "any evidence which may be adduced *in support of the objections."*

The imposition of a duty on a legislative agency to receive and consider evidence in connection with a hearing provided for in a statute, does not *per se* signify that the hearing is to be of the trial type. For example, in *Norwegian Nitrogen Prod. Co. v. United States,* 288 *U. S.* 294, 53 *S. Ct.* 350, 354, 77 *L. Ed.* 796 (1933), a source case in this field of the law, such was the holding. In that case it appeared that the Tariff Act of 1922 authorized the President to increase or decrease the rates of duty specified in the act if he found upon investigation that such action was necessary to equalize the difference in the cost of production in the United States and elsewhere. After prescribing certain factors to be considered, Congress provided also that no proclamation should be issued until an investigation to assist the President had been made by the United States Tariff Commission, which was authorized to adopt such reasonable procedure, rules and regulations as it deemed necessary. The act contained a mandate also that the "commission shall give reasonable public notice of its hearings, and shall give reasonable opportunity to parties interested to be present, *to produce evidence,* and to be heard." (Emphasis added.)

The Tariff Commission gave public notice that it would conduct an investigation as to the differences in cost of producing sodium nitrate in this country and elsewhere, and that it would hold a public hearing thereon on the date fixed in the notice. The investigation was made and considerable confidential data obtained from the principal domestic producers as to their production costs. At the public hearing, Norwegian Nitrogen Products Co., a corporation of Norway, demanded that all such data be submitted to it for study, that the investigators working for the Commission be required to produce them or be cross-examined about them. The Commission refused but said that as to all the subjects of inquiry Norwegian would be permitted to offer any evidence it was able to present, and to be heard in oral and written argument thereon. Norwegian then declined to offer any testimony. Subsequently, a report was made to the President and as the result he ordered an increase in the rate. Thereafter, the validity of the increases was attacked on an allegation that the type of hearing called for by the statute was not granted. The court held to the contrary, Justice Cardozo saying:

"What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process. * * * The inference is, therefore, a strong one that the kind of hearing assured by the statute to *those affected by the change* is a hearing of the same order as had been given by congressional committees when the legislative process was in the hands of Congress and no one else. To be sure there has been a change of sanction. What was once a mere practice has been converted into a legal privilege. But the limits of the privilege were not meant to be greatly different from those of the ancient practice that has shaped the course of legislation." 288 *U. S.* at *page* 305, 53 *S. Ct.* at *page* 354.

"Nothing in the statute suggests a belief of the lawmakers that every producer or importer was to be viewed, like a party to a lawsuit, as the adversary of every other, with the privilege of examination and cross-examination extended through the series. 'There must be a limit to individual argument in such matters if government is to go on.' Holmes, J., in *Bi-Metallic Invest. Co. v. State Bd. of Equalization*, 239 *U. S.* 441, 445, 60 *L. Ed.* 372

[375], 36 *S. Ct.* 141." 288 *U. S.* at *page* 308, 53 *S. Ct.* at *page* 355.

"The Tariff Commission advises; these others ordain. There is indeed this common bond that all alike are instruments in a governmental process which according to the accepted classification is legislative, not judicial. * * * Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely investigates and advises. The traditionary forms of hearing appropriate to the one body are unknown to the other. What issues from the Tariff Commission as a report and recommendation to the President, may be accepted, modified, or rejected. If it happens to be accepted, it does not bear fruit in anything that trenches upon legal rights." 288 *U. S.* at *page* 318, 53 *S. Ct.* at *page* 359.

The statute of New Jersey, *N. J. S. A.* 4:12A–1 *et seq.,* authorizing the Director of the Milk Control Board to fix prices of milk, was the subject of the litigation in *Abbotts Dairies v. Armstrong, supra.* Section 23 thereof ordained that before fixing prices, the Director should give public notice, conduct a public hearing, and issue "findings of fact and an order based upon the evidence adduced at said hearing." These are more stringent hearing regulations than those now before the court. But the hearing was recognized as legislative in character and no intimation appears in the opinion that the right of cross-examination was conferred thereby on interested persons. 14 *N. J.* at *page* 332.

The authorities to which reference has been made, as well as the specific wording of the statute, lead irresistibly to the conclusion that the hearing provided for was legislative in character and that cross-examination of persons who appeared and made statements was not a matter of right. They are convincing also as to the absence of any right or duty on the part of the planning board to issue subpoenas for witnesses or to require those desiring to be heard to be sworn.

The hearings held by the board were marked by repeated announcements from the chairman that anyone who wished to speak for or against the determination of blight would be heard. Twenty-five persons were heard, most of them

being property owners of the area. A large number of photographs showing existing conditions of vacant land and residences and other types of structures were introduced. One was a large aerial photograph of the area; many of them were produced by the objecting property owners showing their own homes. A series of maps were produced showing (a) land use in the entire city, (b) topography of the project area, (c) housing conditions, (d) undeveloped land, (e) land not properly utilized, (f) extent of blighting factors, and (g) tax delinquent land, in the project area. Presented also was the elaborate report of the planning consultant who made a study of the conditions in the area with respect to blight. A number of letters of objectors were likewise introduced. It is not suggested that the appellants were not given ample opportunity to examine these various documents or to introduce evidence in refutation. However, they furnished no expert witness or report from such person in opposition to the findings of the expert engaged by the housing authority of the city.

 The latter expert, whose detailed report was marked in evidence, made a statement generally outlining its scope. Then he submitted to cross-examination by appellants' counsel for about 4½ hours on two separate occasions. The rigorous questioning covers 113 pages of the stenographic transcript. On the third hearing date, he refused to appear further. Having in mind the legislative character of the proceedings, such failure did not invalidate the final action of the board.

## III.

### The Attack in the Law Division on the Determination of Blight by the Planning Board and the City Commission

Section 6 of the act, which outlines the nature of the hearing before the board, says:

"A determination that the area * * * is a blighted area, if supported by substantial evidence, shall be binding and conclusive

upon all persons affected by the determination." *N. J. S. A.* 40 :55–21.6.

In the Law Division plaintiffs charged that the declaration of blight was not supported by substantial evidence. At the trial they appeared to be seeking a trial *de novo* of the issue of blight and offered evidence pursuant to that objective. However, the trial court refused to treat the action as an original one and so ruled. The suit then proceeded on the thesis that the substantial evidence test was to be applied to the municipal determination.

 Ordinarily, judicial review in a case of this kind would not proceed beyond the ascertainment of whether the local governmental action was arbitrary or capricious, *Schenck v. City of Pittsburgh, supra; State on Information of Dalton v. Land Clearance For Redevelopment Auth., supra; David Jeffrey Co. v. City of Milwaukee, supra,* at 66 *N. W. 2d* 374; or corrupt, irrational or baseless, *Kaskel v. Impellitteri, supra.* It is not necessary to explore the possible nuance of whether, if the evidence shows that the municipal determination was not arbitrary or capricious, it follows, as of course, that the evidence in support is substantial. In any event, we agree with the trial court that the statutory criterion was satisfied.

In the Law Division the testimony and the exhibits presented to the planning board and by it to the city commission were admitted in evidence by consent. That evidence, coupled with additional proofs which were introduced largely upon the claims that certain members of the board and city commission were disqualified to act, that the matter had been prejudged by both bodies prior to the public hearings and that the various resolutions were invalid, constituted the record upon which the issue was resolved. In addition, the trial court made a personal inspection of the area.

From that record the following factual outline is drawn:

The gross area involved is 100.8 acres. As of May 1955, 7.6 acres were in public rights of way, leaving a total net land area of 93.2 acres. Of this property, 55.1 acres were

used for residential purposes and 9.7 acres were devoted to commercial use. The remaining 28.4 acres were vacant and unimproved. In September 1954 the city had liens upon or title to 34.2 acres by reason of tax delinquency.

Proof was submitted to show the project area to be blighted within the meaning of three of the five criteria set forth in *N. J. S. A.* 40:55–21.1. As has been said, this statute contains five definitive subdivisions; if the prevalent conditions of a municipal area conform to any one of the enumerated standards, that area is a proper subject for a determination of blight.

Inspection revealed that 41 of the 71 buildings used as dwellings in the area were so deficient in proper construction or maintenance as to render the area prone to a declaration of blight. A residence was rated as substandard "when it showed serious conditions of disrepair, either of the outside walls, roof, foundation, inside walls, floors or ceilings; when it was of inadequate original construction that did not come up to standards for legal permanent construction; or when it lacked such major facilities as running hot water, a private bath or a private interior flush toilet for each dwelling unit." Specifically, it was determined that many of the structures were in need of extensive repairs, and that over 30 of them were "severely deteriorated" because of obsolescence (one was built in 1866) or poor construction. Included in the latter category was a group of 23 temporary residences which had been erected pursuant to a veterans' project on land owned by the city, and whose rapid deterioration had previously impelled the housing authority to desire their removal. (They were removed after the determination of blight and before the trial in the Law Division.)

In addition, four of the residential properties contained dwellings which were found to be inadequate or lacking in heating and plumbing facilities, and several houses were adjudged to be fit only for summer habitation. Other homes were determined to be substandard in original construction, and some were seen as being unsuitable or dangerous for residential use.

The 41 dwellings found deficient comprised 58% of all of the residential structures in the project area; thus the city housing authority and the expert concluded that a "generality" of the residences in the area conformed to the conditions enunciated by subsection (a) of the statute.

Another portion of the project area was said to be blighted according to *N. J. S. A.* 40:55–21.1(c). It was found that five parcels of unimproved property totaling 28.4 acres, or 21.8% of the gross acreage of the project area, came within this category. This property had not been improved in the past ten years and, in the judgment of the housing authority, it was likely to remain in that state. Future development by private capital was not feasible because of several factors. Three of the parcels were low and swampy in character, and development was contingent upon extensive filling operations. Because of a diversity of ownership of these properties, it was deemed unlikely that the owners would cooperate to effect rehabilitation projects. And it was said of one of them that development "scarcely seems possible." Another parcel, which was owned by the city by virtue of a tax foreclosure, was "fairly isolated from good development." And the fifth property was so poorly subdivided as to make development impractical.

Finally, blight was found in the area under subsection (e) of the statute. It was determined that 42 acres, or 41.7% of the total project area, conformed to that definition. This land included the 28.4 acres of unimproved property, together with five other properties. Of the ten parcels, six were wholly or partly in tax delinquency, and the city had taken foreclosure title to two entire parcels and to part of another. Seven of the properties were vacant, another was only partially developed, and the remaining two were not being used according to their highest potential.

Thus, the expert and the housing authority asserted that in all, 69.7 acres of the project area were blighted under one or more of the statutory definitions. The blighted territory comprised 74.8% of the net project area of 93.2 acres. In this connection, one of the property owners, who testified

before the planning board as an objector and consented to answer some questions on cross-examination, indicated that he was "afraid of this plan because [he did not] feel that the people who are going to be displaced by it will receive sufficient recompense to put them back on the same status they are, in the same type location, without a cost economically to them more than they can afford." Then he was asked:

"Q. * * * What do you think of the area as a whole? Right from Branchport down to the other end?

A. Right from one end to the other?

Q. Yes.

A. The unfortunate part of it is, gentlemen, you asked me sort of a loaded question. I might as well come out and tell the truth now. The area as a whole in its entirety is blighted, in my personal opinion. Of course, the Judge may not see eye to eye with me—much to my joy. However, I think you bit off a little more than you could chew when you included all the property to the west of the Baruch estate [a small portion at the westerly end of the project area]." (Addition ours)

Many of the pictures introduced portrayed dilapidated homes and other buildings, which were obviously beyond restoration. Some produced by individual property owners showed their homes. The great majority of these were advanced in years and of summer residence type construction; some obviously needed painting; others appeared to be in good condition. With few exceptions, the objectors spoke in terms of the condition of their own properties rather than of the overall state of the area. One such person referred to "an isolated" portion where his and several other properties "were kept up" and he saw no reason why that section had to be included in the general plan. Another witness, a member of the bar who had lived in the locality for many years, said he was shocked to see the condition of the waterfront area. He felt that it had "reached a very low ebb." And he said: "We feel that as far as Long Branch is concerned that the waterfront is the bright spot for the city, which could be the greatest asset your city could have. * * *"

It is obvious from the record that the members of the planning board were very familiar with the section involved

and that they had made specific inspections in connection with this matter. One of them had lived in the neighborhood for 30 to 35 years.

At the request of counsel, the trial judge made a tour of the area. After doing so and studying the record made before the planning board, he came to the conclusion that "there was both abundant and substantial evidence to support the findings that the area in question is blighted within the meaning of the statute." Our own study has revealed no justifiable ground for interference with that result.

 It is understandable that individual property owners, who believe their homes to be in good condition and fully adapted to purposes of residence, find it difficult to accept a determination of blight. Obviously, the prospect of dislocation adds to that difficulty. However, the process contemplated by the law cannot be accomplished by means of individual selection of property. It must proceed in terms of redevelopment of areas. Such improvements will inevitably envelop some property or properties which, standing alone, cannot be so described. When this occurs, the individual must bow to the public welfare and accept just compensation for his deprivation.

## IV.

 Plaintiffs allege that certain members of the planning board were disqualified to act because of personal or pecuniary interest. *N. J. S. A.* 40:55–1.4 is cited in support of the charge. It prohibits a member of a planning board from acting in any matter in which he has either directly or indirectly any personal or financial interest. It appears that the chairman of the board was the president, a director, and a stockholder of a bank holding some mortgages on property in the area; another member was a director and stockholder of the same bank; a third was health officer of the city and owned and resided on premises about 300 feet from the project area. In our judgment, the so-called interest of these persons is so remote and contingent as not to warrant

disqualification. The cases of *Hochberg v. Borough of Free-hold*, 40 *N. J. Super.* 276 (*App. Div.* 1956), certification denied 22 *N. J.* 223 (1956); *Zell v. Borough of Roseland*, 42 *N. J. Super.* 75 (*App. Div.* 1956); and *Aldom v. Borough of Roseland*, 42 *N. J. Super.* 495 (*App. Div.* 1956), are not to the contrary.

The mayor of the city, who voted for the blight resolution as a member of the governing body, was a director and stockholder of a bank and savings and loan association which held some mortgages in the area. This was not sufficient reason to bar him from performing his official duties. Other suggestions as to disqualification of the various members do not supply sufficient basis for such a ruling.

## V.

Complaint is made that the city solicitor improperly participated in the proceedings before the planning board, thereby invalidating its resolution. There is no doubt that *N. J. S. A.* 40:55–21.1 *et seq.* contemplates independent action and determination on the part of the board and the city commission. Each body had its own attorney and propriety demanded that his advice be confined within the sphere of his own agency. See *Dolan v. DeCapua*, 16 *N. J.* 599 (1954).

It is plain from the record that the city solicitor appeared at the hearings and advised the planning board as to procedure and rulings on evidence. This was done despite the presence of the board's own attorney. The intrusion was improper, even though motivated by good faith. However, since no prejudice seems to have resulted to the plaintiffs, we do not find it fatal to the validity of the proceedings.

## VI.

Several other grounds of appeal have been argued. All of them have been examined. They present no cause for reversal.

The judgment of the Law Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, FRANCIS and PROCTOR—6.

*For reversal*—None.