62 N.J. Super. 562 (1960)
163 A.2d 396
ALBERT STAHL, LOUIS BARISO, JOSEPHINE BARISO, THERESA PERRONE, ROSE KEEN, JOHN McGUIGAN, LINA McGUIGAN, THOMAS CURLY, FRANK WIEME, EDAWARD VAN PUT, VALERIE VAN PUT, JEROME C. ROTSAERT, VIOLA ROTSAERT, ALBERT WOZNEY, WANDA WOZNEY, JOHN H. MALONE AND STANLEY PORYCKI, PLAINTIFFS,
v.
BOARD OF FINANCE OF THE CITY OF PATERSON, BOARD OF PUBLIC WORKS OF THE CITY OF PATERSON, PLANNING BOARD OF THE CITY OF PATERSON, HOUSING AUTHORITY OF THE CITY OF PATERSON, AND CITY OF PATERSON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 27, 1960.
*567 Mr. Morris Dobrin, attorney for the plaintiffs (Mr. Michael J. Muscarella, of counsel).
Mr. Theodore D. Rosenberg, attorney for the defendants Board of Finance, Board of Public Works, Planning Board, and City of Paterson.
Mr. Carl Gelman, attorney for the defendant Housing Authority of the City of Paterson.
KOLOVSKY, J.S.C.
This matter is before the court for decision after trial of an action in lieu of prerogative writs instituted by plaintiffs, owners or tenants of 11 properties lying within an area which has been referred to by the parties as the "Bunker Hill Renewal Area," to review determinations of the Planning Board, the Board of Finance, and Board of Public Works of the City of Paterson that the Bunker Hill Renewal Area is a "blighted area" within the meaning of N.J.S.A. 40:55-21.1.
Community planning and redevelopment has been, for a number of years, a matter of concern in the City of Paterson. Paterson has a planning board, originally created in 1930, and a housing authority, originally created in 1942, which is the urban renewal agency of the city.
Among the powers granted to planning boards by the Municipal Planning Act (1953), N.J.S.A. 40:55-1.1 to 40:55-1.29, was the power to
*568 "* * * prepare, and after public hearing, adopt, and from time to time amend, a master plan for the physical development of the municipality which generally shall comprise land use, circulation, and a report presenting the objectives, assumptions, standards and principals which are embodied in the various interlocking portions of the master plan. The master plan shall be a composite of the one or more mapped and written proposals recommending the physical development of the municipality which the planning board shall have adopted either as a whole or severally after public hearing. Such master plan may include proposals for various stages in the future development of the municipality." N.J.S.A. 40:55-1.10.
Pursuant to the power thus granted, the Paterson Planning Board, after causing a study to be made, adopted a master plan for the City of Paterson. The plan, entitled "Master Reference Plan," was adopted by the planning board on December 29, 1955, after a series of nine public hearings.
Among other things discussed in the master plan was the prospect for redevelopment of the Bunker Hill Area for industrial purposes. Page 27 of the "Master Reference Plan" reads as follows:
`The lack of suitable industrial sites presents a critical situation in Paterson. With most of the industrial buildings in the City in a state of obsolescence, with much of the area intended for industry invaded by residential development, and with most of the area open to industry cut up into small ownerships, there is need for an aggressive attack on the problem. Redevelopment offers the most promising avenue of attack.
Title I of the U.S. Housing Act makes it possible to include commercial as well as residential redevelopment. The development agency, with powers of condemnation as an aid, acquires, clears, replans, and sells the land for new development. Two-thirds of the financial deficit in the whole operation is paid by the Federal Government and one-third by the City. The City's contribution may be in the form of needed public facilities in the area such as sewers, parks, playgrounds, and schools.
As an example of the possibilities of large scale redevelopment for industry, a sketch study was made of the Bunker Hill area located between River Street and the Passaic River. Possible development compared with existing conditions appears in the illustration above. (Reference is to sketches at the top of the page.)
Principal features of the suggested layout consist of:
1. Elimination of residence hopelessly surrounded by industry.
2. Revision of street system creating sites suitable for industry.
*569 3. Reduction of land coverage, affording space for off-street parking.
4. Building set-backs to facilitate off-street loading and to provide landscaping possibilities."
As the maps forming part of the "Master Reference Plan" and the evidence before me disclose, the Bunker Hill area, which comprises a little less than 36 acres, is a "residential island"  although it contains some commercial and industrial structures  in the large industrial area, semi-circular in shape, which is bounded on the north, the west and the southwest by the curving Passaic River, and on the southeast by the tracks of the Erie Railroad. The Bunker Hill Renewal Area is an irregular area bounded by Branch Street and the rear lot lines of the property on the north side of Sixth Avenue on the north, by Wait Street and the Erie Railroad tracks on the east, by Rye Street on the south, and by the Passaic River and Shady Street on the west.
In February, 1957 the housing authority made application to the Federal Government for monies with which to conduct a survey to determine whether the Bunker Hill area would qualify for redevelopment with financial aid from the Federal Government pursuant to Title I of the U.S. Housing Act of 1949, as amended. In January 1958 the federal agency authorized, and in February 1958 the housing authority accepted, a grant of $58,000 to make the survey.
The state legislation authorizing the action initiated by the housing authority is L. 1949, c. 300, as amended (N.J.S.A. 55:14A-31 et seq.) whose purpose, in the language of its title, is, inter alia:
"* * * to authorize housing authorities to clear blighted areas and prevent blight; to acquire real property and make it available for redevelopment by private enterprise or by public agencies in accordance with approved redevelopment plans; and to confer necessary powers on housing authorities, cities and other public bodies, and to make obligations issued by housing authorities in connection with redevelopment projects legal investments and security for deposits; to enable the advance preparation of projects so they can provide jobs and stimulate industry when necessary in the period of reconversion * * *."
*570 By N.J.S.A. 55:14A-33 a determination that an area is a "blighted area" is one to be made by the municipality after investigation, notice and hearing in accordance with the provisions of the "Blighted Area Act," L. 1949, c. 187, as amended (N.J.S.A. 40:55-21.1 et seq.), entitled,
"An Act defining `blighted area,' authorizing municipalities to determine that areas are blighted areas, and to undertake the clearance, replanning, development and redevelopment of such areas."
The policy considerations underlying the state legislation, and the federal legislation providing federal financial aid for slum clearance and redevelopment, were thus stated by Mr. Justice Francis in Wilson v. City of Long Branch, 27 N.J. 360, 370-372 (1958), certiorari denied 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104:
"Community redevelopment is a modern facet of municipal government. Soundly planned redevelopment can make the difference between continued stagnation and decline and resurgence of healthy growth. It provides the means of removing the decadent affect of slums and blight on neighboring property values, of opening up new areas for residence and industry. In recent years, recognition has grown that governing bodies must either plan for the development or redevelopment of urban areas or permit them to become more congested, deteriorated, obsolescent, unhealthy, stagnant, inefficient and costly. As a result, at least 38 states now have remedial legislation similar to that of New Jersey. Jacobs & Levine, `Redevelopment: Making Misused and Disused Land Available and Usable,' 8 Hastings L.J. 241 (1957). Even if there were no express constitutional sanction for redevelopment of the type described in our statute, ample authority to do so might be found in the well of police power. Manifestly, the purposes to be served are intimately related to the public health, welfare and safety and so are consonant with both Federal and State Constitutions. * * *." (27 N.J., at pp. 370-371.)
"Moreover, if there were any doubt at the state level of the compatibility of the statute in question with our organic law, it would be dispelled by the 1947 Constitution, which contains specific approval and authorization of redevelopment projects. Art. VIII, Sec. III, par. 1 declares:
`1. The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired. Municipal, public or *571 private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment, * * *.'" (At p. 372.)
A field survey of the Bunker Hill area was made by the housing authority, which in May 1958 filed with the federal agency a report of its survey indicating that the area was a blighted area and eligible for redevelopment assistance under the federal legislation.
On February 10, 1959 the housing authority adopted a resolution reciting, inter alia, that it had completed survey and planning work for a "Redevelopment Project" in the Bunker Hill area; that it was preparing an application for a federal loan and grant, the application including an "Urban Renewal Plan" for the area as required by both the state and federal legislation; that under the applicable legislation the authority could not acquire any real property for redevelopment projects in the area unless the governing body of the City of Paterson  which the resolution indicated included both the board of finance and board of public works of the city  first determined that the project area was blighted in accordance with the "Blighted Area Act," had approved the urban renewal plan and had determined that it conformed to the duly approved master plan of the city; "that it is essential that a Cooperation Agreement of the redevelopment of the project area be entered into between the City and the Authority"; and that it was necessary that the action be taken prior to the execution by the authority and the federal agency of a loan and grant contract for the project area. The resolution approved the acquisition of the project area as a site for a slum clearance and redevelopment project and requested the board of finance and board of public works to proceed to make a determination as to whether the project area is a "blighted area," and for that purpose to require the planning board to make an investigation and hold a public hearing as provided for in the Blighted Area Act, and to take the other steps required by both the state and the federal legislation.
*572 The "Urban Renewal Plan" was submitted to and approved by the housing authority at its meeting of April 22, 1959. Contemporaneously, the housing authority filed a loan and grant application with the federal agency. Thereafter, and on May 5 and May 14, 1959, respectively, identical resolutions were adopted by the board of public works and the board of finance, which, after reciting the action theretofore taken and the resolution theretofore adopted by the housing authority, determined:
1. That the planning board should in accordance with the state acts "proceed to make an investigation, hold a public hearing, and make a determination as to whether the project area or any part thereof is or is not a blighted area."
2. That notice of the hearing be published and mailed.
3. That the notice should include a statement that pursuant to the Federal Act a public hearing must be held before any land for an urban renewal project can be acquired by the authority.
4. "That the City Engineer of the City of Paterson shall cause to be prepared a map of the project area showing the boundaries to be investigated and the location of the various parcels of property included therein, to which map shall be appended a statement setting forth the basis of the investigation to be prepared by the planning board."
5. "That the planning board shall, upon completion of its investigation, and after holding a public hearing, make a determination and submit a report thereon" to the board which adopted the resolution for its approval, disapproval or modification.
6. That the planning board be requested to review the urban renewal plan prepared by the authority for the project area and submit its recommendation concerning such plan.
At its meeting of May 19, 1959 the planning board received a letter dated May 8, 1959, written by the director of the urban renewal of the housing authority, enclosing a copy of the resolution adopted by the board of public works, and asking for speedy action because the federal agency's review of the authority's application was "progressing very rapidly." At that meeting, the planning board, by motion, designated June 8, 1959, at 8 P.M., as the time, and "Public School No. 12 as the place, for the public hearing on the Bunker Hill Urban Renewal Industrial Project." Notice of the proposed hearing was published on May 25 and June 1, 1959.
*573 Although the resolution of the board of public works had directed that a map of the area be prepared by the city engineer and filed with the city clerk, this was not done. Instead, a map in the form required, dated April 15, 1959, which had been prepared for the housing authority by Community House & Planning Associates of New York City was filed with the city clerk prior to the first publication.
A public hearing was held at Public School No. 12 on June 8, 1959. Representatives of the housing authority, as well as various objectors, including some of the plaintiffs herein, spoke. On June 16, 1959 the planning board adopted a resolution finding the area to be a blighted area and forwarded copies of the resolution to the board of public works and the board of finance. On the same day, June 16, 1959, the board of public works adopted a resolution determining that the area was a blighted area, and on June 25, 1959 a similar resolution was adopted by the board of finance. On July 15, 1959 plaintiffs filed a complaint in their first action, Docket No. L-15163-58 P.W., attacking the action taken by the governmental units on several grounds, including the fact that the last publication of notice of the hearing was less than ten days prior to the hearing, contrary to the notice provision of the Blighted Area Act.
The first action is still pending but has become moot and should be dismissed without prejudice and without costs because the municipal bodies concede that they do not rely on the determinations of blight made following the June 8 hearing. On August 11, 1959 the housing authority adopted a new resolution requesting the city boards to take steps to hold a new public hearing. No new resolutions were adopted by the board of public works or the board of finance. The hearing thereafter held on September 10, 1959 by the planning board was held under the authority of the May 1959 resolutions of the board of public works and the board of finance.
At its meeting of August 18, 1959 the planning board adopted a motion fixing "Public School No. 10 as the place and September 10, 1959, at 8 P.M., as the time for the *574 hearing in connection with the Bunker Hill Industrial Project." Due notice of that hearing was published on August 21 and 28, 1959, and mailed to property owners as required by the statute.
A stenographic transcript of the public hearing held on September 10, 1959 was marked into evidence and has been reviewed by the court. Ninety-eight written objections had been filed by Mr. Dobrin, attorney for the plaintiffs herein, on behalf of various property owners and tenants in the area. An opening statement was made by the executive director of the planning board, followed by an outline of the legal basis for the hearing by the secretary of the board. A lengthy statement was then read on behalf of the housing authority by Mr. Bentele, its director of urban renewal. The statement, after explaining the purpose of redevelopment and urban renewal and the proposed plan of redevelopment, set forth the reasons why the housing authority felt that the Bunker Hill area was a blighted area. Reference was made to two field surveys conducted by the housing authority in April 1958 and September 1959, to the percentages of dwellings found to be substandard and physically unsound, and to the additional criteria taken into consideration by the housing authority in determining that the area was a blighted area within the meaning of the state and federal laws. The report set forth the anticipated cost of the project, the contributions to be made by the Federal Government and municipality, the obligation of the housing authority to relocate displaced persons from the area, and that the federal agency had approved the various reports after submission of various reports and plans for the project submitted by the housing authority. Statements from objectors were then called for. John Malone, president of the Bunker Hill Citizens Association, a corporation not for pecuniary profit formed by a group of objectors to the project, introduced Mr. Dobrin to speak for his group.
After an opening statement in which he attacked the proceedings on various legal grounds and argued that the *575 "Master Reference Plan" did not indicate that the Bunker Hill area was a blighted area, Mr. Dobrin criticized the test used by the housing authority in its determination that the area was blighted. He then offered the testimony of four real estate men, each of whom had visited approximately one-fourth of the 163 dwellings in the area. Photographs of the dwellings, as well as written reports giving details of the physical condition of the buildings, were submitted by plaintiffs' witnesses and received into evidence by the planning board. In substance, these four witnesses stated that the area is not blighted and that the buildings, with perhaps a few exceptions, are not substandard, unsafe, unsanitary, dilapidated, or obsolete.
In addition, objection was voiced by the owner of a factory in the area, as well as by individual property owners, the latter objecting to the insufficiency of the proposed removal allowances and the alleged inadequacy of the proposed method for determining compensation for property to be taken. One landowner spoke in favor of the proposed redevelopment. Several days after the adjournment of the hearing of September 10, 1959 the planning board directed its executive staff to make a house-to-house field survey of the area; this, according to the testimony of the planning board members, because of the apparent discrepancy between the findings of the housing authority and those of the objectors' real estate experts. The executive staff of the planning board then proceeded to make the field survey which they had been directed to make. The exteriors of all 163 dwellings were inspected, as were the interiors of the 132 dwellings into which they were able to gain access. In addition, for purpose of comparison, an analysis was made of three prior field surveys of those dwellings: (1) That which had been submitted by the real estate men who had testified on behalf of the objectors at the hearing of September 10, 1959; (2) that which had been made by the housing authority in the spring of 1958; and (3) that which had been made by the Cleminshaw Company, a real estate *576 appraisal firm which had revalued the real estate in Paterson as part of the city's real estate tax reassessment program.
Members of the planning board were kept informed of the progress of the survey by the staff, which, at the conclusion thereof, submitted to the planning board a written report (to be discussed infra) in which the staff found that the conditions in the area were such as to constitute it a "blighted area" under four of the five alternative tests listed in N.J.S.A. 40:55-21.1. At its meeting of December 15, 1959, when it formally received its staff report, the planning board adopted a resolution in which it found that the Bunker Hill Renewal Area was a blighted area within the meaning of N.J.S.A. 40:55-21.1, and so notified the board of public works and board of finance. The evidence shows that Mr. Malone, president of the Bunker Hill Citizens Association, as well as some other residents of the area, were present at the meeting of December 15, 1959.
Having received the resolution and findings of the planning board, the board of public works on December 16, 1959 adopted a resolution determining that the area was a blighted area within the meaning of N.J.S.A. 40:55-21.1 and 55:14A-33. On December 29, 1959 a similar resolution was adopted by the board of finance.
Although the statute requires that a copy of the resolution determining an area to be a blighted area should be served on all those who have filed written objections within ten days after the determination is made, it appears that such written notice was not served until February 15, 1960, more than a month after the present action was instituted.
On January 12, 1960 plaintiffs filed this action to set aside the determinations made.
The foregoing sets forth the chronology of events. Plaintiffs attack the determinations made and the proceedings leading thereto on a number of grounds, now to be discussed.
(1) Plaintiffs contend that the determinations that the area is a blighted area are arbitrary and unreasonable and *577 are not supported by substantial evidence. See N.J.S.A. 40:55-21.6; Wilson v. City of Long Branch, 27 N.J. 360 (1958). I cannot agree.
The functions of the planning board and of the governing body of the municipality under the Blighted Area Act is to determine the existence or non-existence of conditions which constitute a particular area a blighted area under the five alternative statutory definitions found in N.J.S.A. 40:55-21.1, which provides:
"As used in this act, the term `blighted area' shall mean an area in any municipality wherein there exists any of the conditions hereinafter enumerated:
(a) The generality of buildings used as dwellings or the dwelling accommodations therein are substandard, unsafe, insanitary, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living;
(b) The discontinuance of the use of buildings previously used for manufacturing or industrial purposes, the abandonment of such buildings or the same being allowed to fall into so great a state of disrepair as to be untenantable;
(c) Unimproved vacant land, which has remained so for a period of ten years prior to the determination hereinafter referred to, and which land by reason of its location, or remoteness from developed sections or portions of such municipality, or lack of means of access to such other parts thereof, or topography, or nature of the soil, is not likely to be developed through the instrumentality of private capital;
(d) Areas (including slum areas), with buildings or improvements which by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community;
(e) A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of the land potentially useful and valuable for contributing to and serving the public health, safety and welfare."
The facts disclosed in the report of the executive staff of the planning board, which is supported by information contained in the records of their field survey, constitute *578 substantial evidence in support of the board's findings that the area is blighted within the statutory definition  this even without considering the personal inspections made by the members of the planning board.
So, with respect to the test provided by paragraph (a) of N.J.S.A. 40:55-21.1,
"The generality of buildings used as dwellings or the dwelling accommodations therein are substandard, unsafe, insanitary, dilapidated, or obsolescent, or possess any of such characteristics, or are so lacking in light, air, or space, as to be conducive to unwholesome living,"
the report shows that of the 132 residential buildings whose interiors were inspected,

"65% ... were deteriorated, deteriorating, or obsolescent;
 85% ... possessed daylight obstruction;
 61% ... lacked central heating;
 67% ... had over half of its rooms without installed heaters;
 59% ... had over half of its rooms without closets;
 48% ... had one or more of its rooms substandard in area;
 16% ... had combined room facilities;
 17% ... had cold running water only;
 17% ... lacked baths;
 11% ... lacked dual egress;
 15% ... had infestation or great potential of it;
 20% ... were unsanitary or possessed great potential of it;
 56% ... had deteriorated, deteriorating, or dilapidated basements;
 15% ... had crowding of persons per room;
 20% ... had crowding of persons per sleeping room;
 31% ... had deteriorated, deteriorating and substandard toilet units."

As to the 31 dwellings whose interiors were not inspected, the report commented:
"Inspection of the exteriors of these thirty-one (31) dwellings combined with data on age of structures and other data leads the staff to the conclusion that had it been feasible to include information on the interiors of these dwellings the total degree of blight would be greater than that represented by the figures applying to the 132 dwellings."
*579 With respect to the test provided by paragraph (b) of N.J.S.A. 40:55-21.1,
"The discontinuance of the use of buildings previously used for manufacturing or industrial purposes, the abandonment of such buildings or the same being allowed to fall into so great a state of disrepair as to be untenantable,"
the report says:
"The final project report of the Urban Renewal Division of the Paterson Housing Authority reveals that eleven (11) industrial buildings exist in the project area and that 100% are deteriorated, deteriorating, or dilapidated. Their physical state of condition, obsolete design and arrangement, and general neglect renders them substandard."
This finding by the urban renewal division is not disputed by anything in the record.
With respect to the test provided by paragraph (d) of N.J.S.A. 40:55-21.1,
"Areas (including slum areas), with buildings or improvements which by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community,"
the report states:
"The investigation revealed:
1. that of the total of 163 structures, 72% were constructed prior to 1899, with the average construction date of all the structures being 1893  one structure was constructed in 1857. The structural design of the buildings and functional arrangement of rooms, both a result of faulty and out dated construction, is grossly inadequate in terms of todays living standards;
2. that of the 163 structures 77% had deteriorated or deteriorating exteriors;
3. that the residential structures occupy in most instances 70 to 80% of the lot coverage, with accessory structures often increasing this coverage. Resulting from this is the fact that 84% of all the residential structures have daylight obstruction;
*580 4. that the dwellings in the Bunker Hill urban renewal area constitute a residential island completely surrounded by industry. The total land area is 35.27 acres of which;
a) 35% is in public streets and right-of-ways
b) 42% is in residential land use;
c) 19% is in industrial land use;
d) 3% is in unimproved vacant land;
e) 1% is in commercial land use.
As a result, adverse and deleterious effects accrue with neither industry nor residence benefiting. The following physical conditions contribute detrimentally to the safety, health, morals, or welfare of the Bunker Hill community;
a) mixed residential, industrial, and commercial structures,
b) heavily truck-traveled streets which are narrow, congested, and in a pattern unsuited to truck traffic and hazardous for residential land use;
5. that park and playground facilities are inadequate to serve the residences, and that school children have to go outside of this area to attend school;
6. that 15% of the dwellings inspected had infestation or great potential of it, that 20% of the dwellings inspected were found to be insanitary or possessed great potential of it, that 31% had deteriorated, deteriorating and substandard toilet units. In addition to this, it was found necessary to report two (2) cases to the Board of Health because this nature was one of extreme emergency."
With respect to the test provided by paragraph (e) of N.J.S.A. 40:55-21.1,
"A growing or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein and other conditions, resulting in a stagnant and unproductive condition of the land potentially useful and valuable for contributing to and serving the public health, safey and welfare,"
the report discloses that ownership of the 157 parcels of property involved is distributed among 144 owners, making it difficult, if not impossible, to assemble tracts large enough for industrial expansion or use; then refers to the susceptibility of the area to flooding from the Passaic River, and expresses the staff's opinion that the use of land for industrial development would be the "productive and desirable use of land in terms of Paterson's overall economic development."
I have examined a number of the reports submitted by *581 the real estate men who testified on behalf of the objectors at the hearing of September 10, 1959, and the photographs submitted therewith. Many of the reports seem to have been prepared by the landowners themselves; many are incomplete in important details. Further, regardless of what is contained in the reports submitted by the objectors, the field survey and report of the executive staff of the planning board remain substantial evidence supporting the planning board's determination.
Many of the objectors contend that their dwellings are comfortable and adequate dwelling places which, they say, cannot be considered substandard, obsolete, or blighted.
It is true that some of the dwellings are in good condition and not substandard. But this does not affect the validity of the defendants' determinations. The fact that the area found to be blighted may include a number of sound structures or buildings, or even that it includes structures which are not substandard, does not vitiate the governmental action. See Wilson v. City of Long Branch, 27 N.J. 360, 379 (1958); Berman v. Parker, 348 U.S. 26, 75 Sup. Ct. 98, 99 L.Ed. 27 (1954).
As Mr. Justice Francis said in Wilson v. City of Long Branch, supra, 27 N.J., at page 381:
"* * * Denial of the right of the municipality to draw within a blighted area certain houses or buildings which are in good condition, would be in some instances to defeat the overall legislative purpose, namely, the redevelopment of blighted areas."
At page 395:
"It is understandable that individual property owners, who believe their homes to be in good condition and fully adapted to purposes of residence, find it difficult to accept a determination of blight. Obviously, the prospect of dislocation adds to that difficulty. However, the process contemplated by the law cannot be accomplished by means of individual selection of property. It must proceed in terms of redevelopment of areas. Such improvements will inevitably envelop some property or properties which, standing alone, cannot be so described. When this occurs, the individual must bow to the public welfare and accept just compensation for his deprivation."
*582 (2) Plaintiffs next contend that,
"Sometime in the spring of 1959 the defendants devised a scheme or plan to convert the Bunker Hill area into an industrial park and had discussions and made tentative arrangements with some of the industries located in the perimeter of the Bunker Hill area to utilize that area for industrial expansion and with that intent in mind, the defendants in a determined way proceeded to utilize N.J.S.A. 40:55-21.1 et seq., to accomplish their purpose. There was no intent to weigh the evidence in good faith to determine if the area was or was not blighted. The use of the statute was merely a sham to accomplish their illegal scheme."
The charge made is not supported by the evidence, which, on the contrary, discloses the good faith of the municipal agencies.
The proposal by the housing authority to redevelop the Bunker Hill area was initiated in February 1957, when the housing authority filed an application with the federal agency for funds with which to make a survey. The evidence upon which plaintiffs rely in support of their claim that there was an improper or illegal scheme does not support their contentions.
Reference is made to the fact that the executive director of the housing authority in the early part of 1959 carried on negotiations with several industries which he hoped might acquire land and build factories in the area. Such action, far from being improper, was prudent exercise of business judgment. Consummation of the negotiations, which were preliminary in character, were conditional not only on satisfactory terms being agreed on, but also on an ultimate determination by the governing body of the municipality that the area is a blighted area, that the redevelopment project should proceed, and that the municipality should acquire the lands for public use.
Reference is also made to the fact that in March 1959 the planning board was called upon by the housing authority to express its views and approval of proposed changes in the street layouts in the area.
*583 It must be borne in mind that a planning board is concerned with various planning facets of any development or redevelopment of property in the municipality, in addition to the fact-finding function called for by the Blighted Area Act. Its exercise of those other functions did not affect the validity of its action when it was called upon to act in the proceedings instituted under the Blighted Area Act. For, as the court said in Sorbino v. City of New Brunswick, 43 N.J. Super. 554, 577 (Law Div. 1957):
"* * * The planning board, in its investigation and conduct of the hearing, was acting not in a quasi-judicial capacity but as a legislative fact-finding agency preliminary to and in aid of further action at a later date by the governing body. The planning board performed no quasi-judicial function. It had no authority to and did not presume to determine whether plaintiffs' several properties should be taken for public use. It merely determined, after investigation and hearing, that certain conditions existed in the area in question, and that the conditions enumerated in section 1 of the statute having been found to exist, the area was in fact a `blighted area.' Whether or not the properties located in that area shall ever be `taken' for public use is a question that will hereafter be determined by the governing body of the municipality (N.J.S.A. 40:55-21.10). * * *"
Those essentials of due process normally associated with a judicial hearing are not required in legislative hearings of this type. The standards of conduct of such hearings before legislative or administrative agencies are illustrated by the following cases relied on in Sorbino and Wilson: State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 523 (E. & A. 1935); Ryan v. Housing Authority of City of Newark, 125 N.J.L. 336 (Sup. Ct. 1940); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933).
(3) Plaintiffs say that the planning board did not conduct a preliminary investigation as required by N.J.S.A. 40:55-21.2.
Plaintiffs contend that the only investigation which may be classified as a preliminary investigation is the field survey made by the executive staff of the planning board *584 subsequent to the September 10, 1959 hearing. Plaintiffs' contention misconstrues the basic statutory plan. Making of a detailed field survey prior to the hearing proper, although perhaps desirable, is not mandatory, particularly where the situation is one such as is shown by the record in this case. The planning board members were thoroughly familiar with the area and had the benefit of surveys which had theretofore been made by the housing authority pursuant to the federal grant. When the hearing of September 10, 1959 disclosed a conflict between the testimony of the objectors' witnesses and the information furnished by the housing authority, the planning board very properly directed its own executive staff to make a detailed field survey of each dwelling in the area. The planning board's final determination was not made until it had received and considered the results of that field survey, as well as the other information which had been furnished to it.
(4) Nor was it necessary for the planning board to hold another public hearing after it had received the results of the field survey made by its staff.
It is suggested that the plaintiffs did not have an opportunity to examine and attempt to refute the factual data contained in the report before the board made its determination. But the objectors had already, at the hearing of September 10, 1959, introduced testimony and reports in support of their claim as to the alleged condition of the properties and the area. Neither the staff nor plaintiffs' witnesses would have been subject to cross-examination. Wilson v. City of Long Branch, 27 N.J. 360, 389 (1958).
It appears from the record that the planning board made its determination after considering all the information before it, including that submitted by the objectors.
(5) Plaintiffs argue that the Blighted Area Act in requiring resolutions by "the governing body" of the City of Paterson, see e.g., N.J.S.A. 40:55-21.2, demands that such action be taken not only by the board of public works and board of finance of the city but also by its board of *585 health, its board of fire and police commissioners, and its board of aldermen.
Plaintiffs' argument is based on the unique governmental structure of Paterson which, in effect, has four governing bodies, each acting within the sphere of powers delegated to it. As I said in Grosso v. City of Paterson, 55 N.J. Super. 164, 170 (Law Div. 1959):
"Prior to the enactment of chapters 45, 46, and 62 of the Laws of 1907 (now R.S. 40:174-6 et seq., 40:186-5 et seq., and 40:175-9 et seq.), the governing body consisted of a mayor and an elected board of aldermen. The 1907 legislation created three boards, a board of finance, a board of public works, and a board of fire and police commissioners, with members appointed by the mayor, and transferred most of the powers theretofore exercised by the board of aldermen among those three boards."
The board of health is a distinct entity and not one of the city's governing bodies. Grosso v. City of Paterson, supra.
But there is no reason to refer to the 1907 legislation to determine what is meant by "governing body" as used in the Blighted Area Act, for the Legislature has specified in the Municipal Planning Act (1953), N.J.S.A. 40:55-1.1 et seq., which "must be treated as in pari materia" with the Blighted Area Act (Wilson v. City of Long Branch, 27 N.J. 360, 383 (1958); see also N.J.S.A. 40:55-21.10) that,
"`Governing body' means the chief legislative body of the municipality. In cities having a board of public works `governing body' means such board." N.J.S.A. 40:55-1.2 (emphasis supplied).
By the express legislative provision the governing body in Paterson for the purposes of the Blighted Area Act and the other planning acts is the board of public works. No action by any of the other governing boards of the city was required; although, in fact, concurrent action was taken by the board of finance apparently because the development project and the federal loan agreement would involve assumption of financial obligations by the city.
*586 (6) Plaintiffs next contend that the proceedings are fatally defective because the planning board allegedly failed to comply with N.J.S.A. 40:55-21.3, which provides:
"Whenever such a resolution is adopted, the governing body, or the planning board, as the case may be, shall first cause to be prepared a map showing the boundaries of the area to be investigated and the location of the various parcels of property included therein. There shall be appended to the said map a statement setting forth the basis for the investigation."
It is conceded that there was filed in the office of the city clerk, prior to the first publication of the notice of the hearing, a map "showing the boundaries of the area to be investigated and the location of the various parcels of property included therein," and that at least prior to the first publication of the hearing of September 10, 1959, there was appended to the map a statement purporting to set forth "the basis for the investigation."
It is also conceded, however, that the map, which is dated April 15, 1959, before the matter was referred to the planning board, had been prepared by Community House & Planning Associates, not at the direction of the planning board but at the request of the housing authority.
The accuracy of the map is not disputed. In my opinion, adoption by a planning board of an existing map showing the information called for is authorized by the cited section; duplication of map preparation is not required.
The planning board should have passed a resolution specifically adopting the map which it had obtained from the housing authority as the map called for by N.J.S.A. 40:55-21.3 and directing that it be filed with the office of the city clerk instead of merely de facto causing the map to be filed in the office of the city clerk. But there is no showing that the omission caused any prejudice to the parties involved; under the circumstances, it does not invalidate the proceedings. See Wilson v. City of Long Branch, 27 N.J. 360, 383 (1958); Griggs v. Borough of Princeton, 33 N.J. 207 (1960).
*587 The "statement setting forth the basis for the investigation," appended to the map is adequate. It sufficiently sets forth what the statute requires; additional detail is not necessary.
(7) Nor can the court agree with plaintiffs' claim that the resolutions adopted by the board of public works and the board of finance in May 1959 were not sufficient to authorize the planning board to hold the hearing of September 10, 1959, and that the authority granted thereby had terminated with the hearing of the planning board on June 8, 1959 and the planning board's determination of June 16, 1959.
The resolutions of the board of public works and the board of finance, adopted in May 1959, requested specific action by the planning board under the Blighted Area Act. As the subsequent action by the board of public works and the board of finance acknowledged, the authority thereby granted continued until the request was complied with by the determination made on December 15, 1959; it had not been terminated by the abortive proceedings of June 1959.
(8) Plaintiffs urge that the proceedings are fatally defective because the planning board considered information contained in block statistics published by the United States Bureau of the Census based on the 1940 and 1950 census, and that such use is prohibited by 13 U.S.C.A., § 8(c). The block statistics show housing characteristics of the city by blocks.
It is not necessary to consider whether, if 13 U.S.C.A., § 8(c) were applicable, the planning board's use of the census statistics would invalidate its findings despite the other substantial evidence in support thereof, for, in the court's view, the federal statute does not bar the use which was made by the planning board of the block statistics.
13 U.S.C.A., § 8(a) and (b), authorize the Secretary of Commerce to furnish specific census information on request. Section 8(c), on which plaintiffs rely, provides:
*588 "In no case shall information furnished under the authority of this section be used to the detriment of the persons to whom such information relates."
Plaintiffs misconstrue the effect of the prohibition contained in § 8(c); it does not prohibit the use of statistical summaries such as appear in the block statistics; its prohibition is directed "to the use of personal information procured from people in the course of taking the census." Supervisors of the County of Boone v. Village of Rainbow Gardens, 14 Ill.2d 504, 153 N.E.2d 16, 22 (Sup. Ct. 1958).
(9) The planning board did not give written notice to the objectors of its determination that the area is a blighted area until February 15, 1960, although N.J.S.A. 40:55-21.6 required that such notice be given within ten days after the determination which was made on December 15, 1959.
The planning board should have complied with the statutory directive, but its failure to give written notice until long after the ten-day period had expired did not prejudice the parties and, under the circumstances shown in this case, is not fatal. Griggs v. Borough of Princeton, 33 N.J. 207 (1960).
The purpose of the notice provision is to enable objectors to seek judicial review of the determination within the 30 days limited by the statute, N.J.S.A. 40:55-21.8 and 40:55-21.9. The record discloses that some of the plaintiffs, including the president of the Bunker Hill Citizens Association, were present at the planning board's meeting of December 15, 1959; in any event, knowledge came to the objectors in sufficient time to enable their attorney to file the complaint in this action within time on January 12, 1960.
Judgment will be entered in favor of the defendants, without costs.