161 N.J. Super. 381 (1978)
391 A.2d 968
WEEHAWKEN ENVIRONMENT COMMITTEE, INC., A NEW JERSEY CORPORATION, BERNARD TUROK, JOSEPH J. WAGNER, JAMES T. DETTE, PETER BARNET AND MARIANNE WUILLAMEY, PLAINTIFFS,
v.
TOWNSHIP OF WEEHAWKEN, A BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, WEEHAWKEN PLANNING BOARD, TOWNSHIP COMMITTEE OF WEEHAWKEN, HOWARD KAPPLER, INDIVIDUALLY AND AS CONSTRUCTION OFFICIAL OF THE TOWNSHIP OF WEEHAWKEN; EDWARD J. KUNTZ, INDIVIDUALLY AND AS BUILDING INSPECTOR OF THE TOWNSHIP OF WEEHAWKEN, EXCEL PROPERTIES CORP., A NEW JERSEY CORPORATION AND TENWOOD TOWERS OF WEEHAWKEN COMPANY, A LIMITED PARTNERSHIP, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 13, 1978.
*385 Mr. Howard Moskowitz for plaintiff Weehawken Environment Committee, Inc. (Mr. Jesse Moskowitz, attorney).
Mr. James Flynn for defendants Excel Properties Corp. and Tenwood Towers of Weehawken Company (Mr. James P. Dugan, attorney).
Mr. Libero Marotta for defendant Township of Weehawken.
Mr. Michael I. Lubin for defendant Weehawken Planning Board (Messrs. Wittman, Anzalone, Bernstein & Dunn, attorneys).
Mr. Michael Milewski for intervenor Hackensack Water Company (Messrs. Waters, McPherson, Hudzin & McNeill, attorneys).
THURING, J.S.C.
Before the court are cross-motions for partial summary judgment. The motions raise the issue of the validity of a municipal governing body's resolution granting tax exempt status to private corporations.
Tenwood Towers of Weehawken Company is the developer of a proposed high-rise, moderate-income housing complex in Weehawken. The land, owned by the Hackensack Water Company, is under contract of sale to Excel Properties Corp., a partner in Tenwood Towers of Weehawken Company (hereinafter both entities Tenwood). The Weehawken Environment *386 Committee, Inc. (Committee) challenges the proposed construction. The litigation represents a consolidation of two separate actions. A prerogative writ action, Committee v. Weehawken Tp., was started in the Law Division. A separate action, Tenwood v. Weehawken Tp., was instituted in the Chancery Division. Both suits were consolidated for trial.
The construction of the project envisions a land subsidy program sponsored by the Federal Government with the financing for the construction provided by the New Jersey Housing Finance Agency under N.J.S.A. 55:14J-1 et seq. That act seeks to facilitate private investment and construction or rehabilitation of moderate income housing through public financing. N.J.S.A. 55:14J-1.
As a prerequisite to the New Jersey Housing Finance Agency financing any building project in a municipality, the governing body must adopt a resolution of need. N.J.S.A. 55:14J-6(b). In addition, where a qualified housing developer, here Tenwood, wishes to obtain special tax treatment or to make payments in lieu of taxes it must obtain a tax abatement resolution and enter into a tax abatement agreement with the municipality. N.J.S.A. 55:14J-30(b). Specific authority for the granting of such a tax abatement is contained in the "Limited Dividends Housing Corporations Law". N.J.S.A. 55:16-18.
On October 24, 1977 the Township of Weehawken adopted a resolution of need pursuant to N.J.S.A. 55:16-12(1), and a second resolution authorizing tax abatement pursuant to N.J.S.A. 55:16-18. A lawsuit challenging the validity of the resolutions was filed, alleging violations of the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq. That lawsuit resulted in a judgment upholding the municipal action of the governing body. An appeal of that judgment is pending.
The makeup of the Weehawken Township Committee changed by virtue of the November 1977 elections with a new majority opposed to the housing project. The new *387 majority of the governing body-elect announced their immediate intention to rescind the resolutions of October 24, 1977, and after they assumed office the resolutions were rescinded on January 20, 1978. Suit was brought by Tenwood attacking the rescinding resolutions.
On February 9, 1978 the Committee served Tenwood with a complaint in the Law Division wherein the first nine counts attacked the site plan approval for various reasons. Counts 10 and 11 challenged the October 24, 1977 resolutions of the township authorizing tax abatement. The Committee also intervened in the Chancery action brought by Tenwood. In the Chancery suit the Committee filed a counterclaim and raised affirmative defenses identical to the counts contained in its Law Division complaint.
Initially, motions filed by Tenwood and the Committee for partial summary judgment were denied by this court, the court feeling that the issues were not yet ripe for determination and because a full background leading to the action taken by the governing body was vital to a clear understanding of the issues raised. At a subsequent pretrial conference the court, upon request by Tenwood, reconsidered its earlier ruling and decided to consider partial summary judgment action on the sole issue relating to the validity of the initial tax exemption resolution passed by the municipal governing body on October 24, 1977 pursuant to N.J.S.A. 55:16-18, on the theory that resolution of this issue might moot the numerous other issues raised. The tax exemption issue raises primarily the question of whether the township, before adopting the tax abatement resolution, was obliged by law to reach its determination of the existence of a blighted area only after investigation, notice and public hearings.
In order to facilitate the respective motions for partial summary judgment all parties have stipulated that at no time prior to the October 24, 1977 resolution had an area in Weehawken ever been declared to be blighted by any relevant governmental subdivision or agency, including the township committee, the Weehawken and Hudson County Planning *388 Boards and the Commissioner of the Department of Community Affairs. In addition, the parties have agreed to the contents of the tax abatement resolution, stipulating that the township committee found that
* * * the proposed development is or will be an improvement made for the purpose of assisting the clearance, replanning, development or redevelopment of blighted areas in this municipality.
Based on these stipulated facts (see Ambassador Ins. Co. v. Rafael Montes, 76 N.J. 477 (1978)), the court finds that there is no genuine issue as to any material fact and that the validity of the tax abatement resolution is ready for summary judgment as a matter of law. R. 4:46-2; Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954).
At oral argument counsel for Tenwood suggested that since the validity of a township resolution was called into question and since it involved a novel question of statutory interpretation, the Attorney General should perhaps first be notified as to the pendency of the action. R. 4:28-4 provides that notice should be given to the Attorney General in certain situations where the validity of a state statute or constitutional provision is questioned. Where the validity of an ordinance, regulation or franchise of a governmental subdivision affecting the public interest is questioned and the subdivision is not a party, then it too should be notified.
R. 4:28-4 plainly here is inapplicable. The validity of a statute or constitutional provision is not questioned, and with respect to the tax abatement resolution both Weehawken Township and the Weehawken Planning Board are parties to the action. Hence, the court sees no reason to delay these proceedings further.
Tenwood interposes first a procedural objection to the Committee's attack on the resolution, arguing that the Committee is out of time under R. 4:69-6(a), which requires action not later than 45 days after the "accrual of the right *389 to review, hearing or relief claimed." Committee concedes that more than 45 days elapsed between the adoption of the October 24 resolution and the filing of its complaint, but urges that because of the extensive public interest generated by the proposed housing project the time limitation ought to be enlarged.
R. 4:69-6(c) provides that the court may enlarge the time period for prerogative writ complaints "where it is manifest that the interest of justice so requires." R. 4:69-6(c) is intended to codify in the form of a general standard decisional exceptions to the limitations period for prerogative writs. One of these exceptions is for cases involving "important public rather than private interests which require adjudication or clarification." Brunetti v. New Milford, 68 N.J. 576, 586-87 (1975). The Committee has submitted numerous newspaper articles on the proposed project covering the past year since it was first introduced to the community. The articles demonstrate a widespread, heated and controversial public debate concerning the project. The residents of Weehawken appear to be deeply interested and highly divided over the project's proposed construction. Tenwood does not dispute the fact that the project has generated intense public interest.
In Cervase v. Kawaida Towers, Inc., 124 N.J. Super. 547 (Ch. Div. 1973), aff'd o.b. 129 N.J. Super. 124 (App. Div. 1974), involving the construction of a proposed housing project and a challenge to the validity of a tax exemption resolution, the moving parties commenced the action well over a year after the right to review accrued. In that case, in some respects similar to the present matter, the court stated with respect to timeliness:
* * * In bringing this action, plaintiffs have plainly failed to comply with the applicable time limitations for challenging action of governmental bodies. R. 4:69. They are clearly out of time. Nevertheless, the questions involved have generated sufficient public interest and therefore have compelled the court to disregard the tardiness of the litigants. The importance to the community of a decision *390 based upon the merits of this controversy has clearly motivated the court's determination to avoid a dismissal of the action based upon procedural technicalities. [at 569]
Here, too, the court finds that the high level of public interest generated by the housing project in question manifestly requires the enlargement of time, and accordingly the court will address the merits of the issue relating to the validity of the tax abatement resolution and the requirements of N.J.S.A. 55:16-18.
The pertinent statutory provision, N.J.S.A. 55:16-18, provides in relevant part as follows:
When the governing body of any municipality in which a project of a housing corporation or housing association is or will be located, by resolution finds that the project is or will be an improvement made for the purpose of the clearance, replanning, development, or redevelopment of any blighted area (as defined in any law of this State) within such municipality, or for any of such purposes, then such project and improvement shall be exempt from all property taxation. * * *
The Committee argues that the foregoing language mandatorily requires that the governing body of Weehawken first make a prior determination of the existence of a blighted area, in accordance with the statutorily prescribed procedures of the Blighted Areas Act, N.J.S.A. 40:55-21.1 et seq. Such statutory procedures encompass investigation, notice and public hearings before a finding of blight may be made. The Committee also contends that the resolution is silent as to which area in Weehawken was declared blighted. Absent such a determination the Committee asserts that the tax abatement resolution was ultra vires and void.
Tenwood's position, on the other hand, is that N.J.S.A. 55:16-18 does not require any declaration of blight other than that contained in the tax abatement resolution itself. It argues that while the legal meaning of "blight" comes from its definition as contained in other law, N.J.S.A. 55:16-18 makes no reference back or incorporation of those *391 detailed procedures mandated for determining blight. Tenwood's position is that N.J.S.A. 55:16-18 mandates its own procedures for declaring blight and tax exemption. Further, it asserts that under Cervase v. Kawaida Towers, Inc., supra, a project, to qualify for tax exemption, need not actually be located in a blighted area. Therefore, it contends that no specific finding as to a particularly prescribed area need be made in the resolution of "blight." In sum, Tenwood concludes that the general wording of the tax abatement resolution was sufficient under the requirements of N.J.S.A. 55:16-18.
Both sides agree that N.J.S.A. 55:16-18 affords tax exemption only for a project designed to improve a blighted area, but disagree as to how such a blighted area is to be determined. It is well settled that governing bodies of municipalities in this State have no powers other than those delegated by the Legislature, and must perform their prescribed activities within the statutory ambit. Scatuorchio v. Jersey City Incinerator Auth., 14 N.J. 72, 85 (1953); Auto-Rite Supply Co. v. Woodbridge Tp., 25 N.J. 188, 195 (1957). Where the Legislature prescribes a certain procedure for determining blight, that procedure must be followed. Wilson v. Long Branch, 27 N.J. 360, 386 (1958). When dealing with real property "[a] municipality must be especially careful to conform to statutory authorizations." Van Ness v. Deal, 139 N.J. Super. 83, 97 (Ch. Div. 1975), rev'd on other grounds 145 N.J. Super. 368 (App. Div. 1976), certif. granted 74 N.J. 262 (1977); Anschelewitz v. Belmar, 2 N.J. 178, 183 (1949).
The issue for the court, then, is primarily one of statutory interpretation as to the intended legislative procedure for determining blight. "In every case involving the application of a statute, it is the function of the court to ascertain the intention of the Legislature from the plain meaning of the statute and to apply it to the facts as it finds them." Woodbury Times v. Gloucester Cty. Sew. Auth., 151 N.J. Super. 160, 166 (Law Div. 1977). The goal of the *392 interpretive process is the intent of the Legislature, and the accomplishment of this purpose must be based on the underlying statutory purpose and on common sense. State v. Provenzano, 34 N.J. 318, 322 (1961).
* * * A reasonable interpretation [of a statutory section] should be made based upon the legislative purpose as revealed by the composite thrust of the whole statute. [State v. Gattling, 95 N.J. Super. 103, 108 (App. Div. 1967), certif. den. 50 N.J. 91 (1967)]
Historical and legislative background becomes necessary for an understanding of the purpose and intent of the Legislature in construing N.J.S.A. 55:16-18.
The basic authority from which tax exempt status for real property springs is contained in N.J. Const. (1947), Art. VIII, § III, par. 1:
The clearance, replanning, development or redevelopment of blighted areas shall be a public purpose and public use, for which private property may be taken or acquired. Municipal, public or private corporations may be authorized by law to undertake such clearance, replanning, development or redevelopment; and improvements made for these purposes and uses, or for any of them, may be exempted from taxation, in whole or in part, for a limited period of time during which the profits of and dividends payable by any private corporation enjoying such tax exemption shall be limited by law. The conditions of use, ownership, management and control of such improvements shall be regulated by law. [Emphasis supplied]
As an exemption from the general constitutional requirement of uniform property taxation (see N.J. Const. (1947), Art. VIII, § I, par. 1), the above recited paragraph permits the Legislature to delegate authority to the municipalities to determine the existence of and to plan for the redevelopment of blighted areas with tax exemption status in accordance with legislatively established guidelines and criteria. Wilson v. Long Branch, supra.
Pursuant to this mandate the Legislature in 1949, under the administration of Governor Driscoll, passed a series of statutes known as the "State Housing Law of 1949," designed *393 to provide low-cost housing and to alleviate the severe statewide housing shortage. Legislative Bulletin on the Low Rent Housing and Slum Clearance Program, issued by the Judiciary Committees of the Senate and General Assembly, May 5, 1949. The statutes represented a comprehensive legislative scheme comprised of several interrelated acts, including the statute here in question, which established definitive procedures for the development of blighted areas. The legislative purpose was to authorize the revitalization of areas qualifying as blighted so they could be made to serve the community welfare. Levin v. Bridgewater Tp. Committee, 57 N.J. 506, 538 (1971). The overriding governing principle was the belief that "[s]oundly planned redevelopment [would] make the difference between continued stagnation and decline and a resurgence of healthy growth." Id., at 540. The concept, in essence, called for sound and careful planning.
As a basic part of the attack on blight the legislative program sought to combine and coordinate a public financial Commitment and involvement, with private developers as instruments for removing blight in accordance with approved redevelopment plans. Id., at 543. Municipalities were authorized, after certain proceedings leading to a determination of the existence of blighted areas, to acquire the land in question by purchase or eminent domain. The municipalities could then proceed with development, or by resolution authorize an approved private corporation or association to undertake such development pursuant to statutory authority and subject to the provisions of N.J. Const. (1947), Art. VIII, § III, par. 1. Wilson v. Long Branch, supra 27 N.J. at 370; N.J.S.A. 40:55-21.1 et seq.
N.J.S.A. 40:55-21.1 et seq., the Blighted Areas Act, was enacted as a basic part of the overall development plan to address the initial question of how to determine blight under N.J. Const. (1947), Art. VIII, § III, par. 1. The historical note to the act provides that it was:
An Act defining `blighted areas', authorizing municipalities to determine that areas are blighted areas, and to undertake the clearance, *394 replanning, development and redevelopment of such areas. [L. 1949, c. 187, p. 626]
The act provided the essential definitions, standards and procedures for determining blight. The five subsections of § 1 define blighted areas and confine the municipal decision as to blight within those limits. See Wilson v. Long Branch, supra at 378. Sections 2 and 7 require a preliminary investigation to determine whether an area in the municipality is blighted or not. Section 3 of the Blighted Areas Act requires that a map be prepared showing the specific areas to be investigated. Where a municipality has a planning board, as does Weehawken, the planning board is responsible, under authority granted by resolution of the governing body, for conducting the investigation and submitting a report to that governing body. Before a final determination that an area is blighted can be reached, §§ 4 through 6 require a public hearing with advance notice to be held for the purpose of hearing objections and evidence presented, if any, by interested persons. Section 8 provides for judicial review of a decision of blight prior to any final determination of blight by the governing body. Such detailed procedures clearly reflect a legislative design to provide for careful, deliberate and sound municipal planning with the right of the public to be heard. The entire scheme militates against hasty or ad hoc action.
Following a final determination by the municipality as to blight, § 10 then authorizes approval by the municipality for a redevelopment plan, to acquire and redevelop the property itself, or to provide for development by a qualified private developer.
In conjunction with the "Blighted Areas Act", supra, the Legislature, as part of the State Housing Law of 1949, enacted a number of related acts to provide for low-rent housing and redevelopment of blighted areas by private developers through the creation of housing corporations and agencies supervised by the Housing Authority in the State *395 Department of Conservation and Economic Development. Legislative Bulletin of the Judiciary Committee, supra.
One of these acts was the Limited Dividend Housing Corporations Law, N.J.S.A. 55:16-1 et seq., which was designed to provide for the creation and regulation of housing corporations and associations in order to permit tax abatement for their projects under the State Constitution, thereby enlarging the area of participation in the private development sector of blighted areas. Erdman, "New Jersey's New Housing Program," N.J. Municipalities, 1949. It is this act, particularly § 18 authorizing tax abatement, to which this summary judgment motion is addressed. With that in mind it is important to look at § 2, the "Legislative Declaration of Necessity". That section recites that there exists an insufficiency of sanitary and fit housing and a need for the construction of new dwellings to alleviate the deteriorated conditions. It then provides:
* * * the creation of the agencies, associations and corporations hereinafter described, is necessary and desirable for this purpose; that the provision of housing to make possible and to assist the clearance, planning, development or redevelopment of blighted areas, as proposed in this act, is a public purpose and a public use for which public money may be spent and private property acquired; ... [N.J.S.A. 55:16-2; emphasis supplied]
Manifestly then, the Limited Dividends Housing Corporation Law is aimed at the revitalization of blighted areas. It is in this context that N.J.S.A. 55:16-18, which provides tax exemption for approved projects, must be construed in determining whether a prior declaration of blight pursuant to statutory procedures of investigation and public hearings is required by the act.
All the referred-to statutes were enacted in the same time span and were all designed for the same basic purpose, i.e., for removing blighted areas and providing for sufficient housing. They must be considered in pari materia. Levin v. Bridgewater Tp. Comm., supra 57 N.J. at 512, *396 515. It is axiomatic that statutes in pari materia must be viewed together in seeking the legislative intent, and "are to be considered `as a homogenous and consistent whole giving effect to all their provisions.'" State v. Green, 62 N.J. 547, 555 (1973); Loboda v. Clark Tp., 40 N.J. 424 (1963).
The court is aware that the action of the municipal governing body comes before it cloaked with a presumption of legitimacy, and that courts are enjoined to adopt a liberal construction of the act in question (N.J.S.A. 55:16-1 et seq.) so as to promote its beneficent purpose. Cervase v. Kawaida Towers, Inc., supra; Levin v. Bridgewater Tp. Comm., supra. However, this does not mean that the court may ignore the plain meaning of the language contained in the statute. Bacon v. Miller, 113 N.J. Super. 271, 275 (App. Div. 1971). Where the statute is precise there is no room for discretionary treatment by the court. Imbriacco v. Civil Service Com'n, 150 N.J. Super. 105, 109 (App. Div. 1977).
Turning again to the precise wording of N.J.S.A. 55:16-18, that section (repeated here for convenience) reads as follows:
When the governing body of any municipality in which a project of a housing corporation or housing association is or will be located, by resolution finds that the project is or will be an improvement made for the purposes of the clearance, replanning, development, or redevelopment of any blighted area (as defined in any law of this State) within such municipality, or for any of such purposes, then such project and improvement shall be exempt from all property taxation; * * * [emphasis supplied]
The language of the statute requires a finding by the municipality that the project "is or will be an improvement * * * of any blighted area." (emphasis supplied) "Blighted area" is that to which the improvement for clearing and redevelopment must apply in order to meet the fundamental first-tier requirements of N.J. Const. (1947), Art. VIII, § III, par. 1, which mandates uniform taxation except for *397 blighted areas. What the legislative intent was in the employment of the words "blighted area" is crucial to an understanding of the thrust of § 18. That section, enacted as part of the over-all 1949 state housing program, had its genesis in the premise that a blighted area was declared pursuant to some other statutory authority with which § 18 was in pari materia, such as the authority found in the Blighted Areas Act. N.J.S.A. 40:55-21.1 et seq.
The qualifying words appearing in the statute addressed to "blighted areas" in § 18  "(as defined in any law of this State)"  were not in the section as originally drafted by the Legislature. Such words were added by amendment in 1949. N.J.S.A. 55:16-18, Historical Note. This addition, undoubtedly, was intended to clarify and to broaden the possible categories of real estate susceptible to a classification of being blighted so that such categories might be enlarged by subsequent legislative action in new statutory schemes concerned with housing. There is no discernable intent that would support an interpretation that the addition to the statute was designed substantively to create within § 18 itself procedures as to how a blighted area was to be determined in the first instance. Cf., Jersey City Chap. Prop. Owner's &c. Assoc. v. City Council, 55 N.J. 86, 95 (1969).
Tenwood's position that § 18 "borrows" from other statutes the definitions of, but not the procedures for, determining blight simply is a non sequitur. Aside from the inherent unfairness of countenancing that which embraces what is for one and rejecting that which is against one, statutes of public import ofttimes cannot be plumbed without resort to companion legislation. Except for the words, "(as defined in any law of this State)" used in the statute, § 18 is silent with respect to procedures for ascertaining blight. In the literal sense then, by its silence, § 18 does not "borrow" procedures for determining blight, but it would amount to short-sightedness to adopt Tenwood's argument in the face of reasoned analysis. That analysis calls for examination of related housing laws.
*398 The entire thrust of the Limited Dividends Housing Corporations Law, of which § 18 is one part, was simply to facilitate and encourage private development of blighted areas already determined. This is patent from the "Legislative Determination of Necessity" in § 2 as discussed supra, and is evident as well from the provisions in the coordinate statutory scheme N.J.S.A. 40:55-21.1 et seq. that upon a determination of blight after investigation, notice and hearings, a municipality may go forward with its own development or enlist the aid of and provide for private development. N.J.S.A. 40:55-21.10.
To understand the significance of blight in § 18 and its specific incorporation of the legal definitions of blight, one must refer to other statutory schemes addressing the blight problem, which schemes contain specific procedures to be followed for determining blight. Virtually all of these acts rely substantially, if not exclusively on the procedures required by the Blighted Areas Act, which is the basic legislation in this area as discussed supra. See N.J.S.A. 40:55C-1 et seq., the Redevelopment Agencies Law; N.J.S.A. 40:55C-40 et seq., the Urban Renewal Corporation and Association Law of 1961; N.J.S.A. 40:55C-77 et seq., the Urban Renewal Non Profit Corporation Law of 1965; N.J.S.A. 55:14A-1 et seq., the Local Housing Authorities Law; N.J.S.A. 55:14E-1 et seq., the Urban Redevelopment Law.
Even the tax exemption statute for private homeowner improvements, N.J.S.A. 54:4-3.72 et seq., relied on by Tenwood as allegedly indicative that tax exemption schemes for blighted areas do not require procedures such as contained in the Blighted Areas Act, provides for a method of prior determination of blight by the county planning board or the Department of Community Affairs after petition by the town governing body. N.J.S.A. 54:4-3.73, 3.74, 3.75. This is substantially similar to the mechanism prescribed by the Blighted Areas Act, N.J.S.A. 40:55-21.2 supra, and implicitly mandates a scheme whereby careful analysis and investigation *399 occurs before an area is declared blighted and thus qualified for tax exemption.
Tenwood argues that those statutes referred to, mandating procedures substantially as contained in the Blighted Areas Act, are concerned with the condemnation of land, while § 18 focuses solely on tax abatement, and hence does not require such detailed procedures. The short answer to this is that both statutes are addressed to blighted areas, and that condemnation of and tax exemption for such blighted areas spring from the same state constitutional authorization and are subject to the same constitutionally mandated restrictive safeguards. Moreover, the statutes relied on by Tenwood for the proposition that such statutes deal only with condemnation do not specifically address the tax exemption issue, because under those statutes once property, needed for a public purpose, is acquired through eminent domain procedures pursuant to Blighted Areas Act, it becomes entitled automatically to tax exemption. See, e.g., N.J.S.A. 40:55C-25; compare Bergen Cty. v. Paramus, 158 N.J. Super. 512 (App. Div. 1978). The essential factor, therefore, is that a careful and prescribed determination of blight has been made pursuant to investigation, notice and hearings. See, e.g., N.J.S.A. 55:14A-20; N.J.S.A. 55:14E-11.
Tenwood also relies on Cervase v. Kawaida, supra, for its position that there need be no determination of blight independent of the tax abatement resolution itself. Cervase v. Kawaida Towers, Inc., supra, as does the present case, concerned an interpretation of N.J.S.A. 55:16-18. It held (at 124 N.J. Super. at 558) only that a tax exempt project need not actually be located in a specific blighted area, because, although not actually located in such an area, it nonetheless "will assist in the clearance, replanning and development of any one of a number of blighted areas in the city by relieving the pressure of people and housing therein." The entire analysis in Kawaida began from the premise that Newark had in the past complied with the Blighted Areas Act, supra, when it *400 "determined and declared the existence of extensive blighted areas." Id. at 556.
Moreover, all the cases of which this court is aware that addressed the question of blight under whatever statutory section found that blight had been determined pursuant to the detailed procedures of the Blighted Areas Act, not the hasty, ad hoc procedures employed in the present case. See e.g., Levin v. Bridgewater Tp. Commn. supra at 509 ("After investigation and hearings, the Township Planning Board resolved that the area was blighted, and thereafter the Township Committee approved that resolution."); Wilson v. Long Branch, supra, 27 N.J. at 368-369 ("[Township Committee by resolution] request[ed] the planning board to make a preliminary investigation and to hold a public hearing for the purpose of determining whether an area of the city referred to therein was blighted. * * * After receiving [the planning board] resolution and report and reviewing the entire matter * * * the board of commissioners approved the determination of blight."); Stahl v. Paterson Bd. of Finance, 62 N.J. Super. 562, 570 (Law Div. 1960), aff'd 69 N.J. Super. 242 (App. Div. 1961) (a determination that an area is a `blighted area' is one to be made * * * after investigation, notice and hearing * * *."); Lyons v. Camden, 52 N.J. 89, 91 (1968) (after investigation and public hearing section of city declared blighted).
It is inconceivable to this court that the governing body of Weehawken could take action of such magnitude without any prior investigation or notice giving the obviously concerned public an opportunity to be heard. Our own Supreme Court has repeatedly referred to the statutory right of the citizens to be heard. Wilson v. Long Branch, supra 27 N.J. at 386 (where a legislative hearing is required that procedure must be followed by the municipality). This is particularly so in the climate of present times. The recent disclosures of the conduct of some of our public officials depicts a world where politics is seldom absent from municipal administration. Without a restriction on the otherwise unfettered power of the *401 municipality dealing with blight and land development projects there is a very real danger of municipal action concerning property, not for the public benefit, but for the benefit of the better politically connected individual. See Levin, supra 57 N.J. at 552 (Haneman, J. dissenting).
The Blighted Areas Act itself withstood constitutional attack as an otherwise unlawful delegation of authority to the municipalities only because the legislative scheme provided sufficient standards and guidelines to control the municipal action. Wilson v. Long Branch, supra; Sorbino v. New Brunswick, 43 N.J. Super. 554 (Law Div. 1957).
In a related vein, both the Blighted Areas Act in § 9, supra, and our own court rules dealing with prerogative writs generally, R. 4:69, provides mechanisms for judicial review of municipal action in instances such as the present case dealing with a determination of blight. That section provides judicial standards of review for determining whether the finding of blight was grounded on substantial evidence. N.J.S.A. 40:55-21.6, 21.9; Levin, supra 27 N.J. at 537.
In the present case there exists no way the court could make an informed judgment of the municipal action, let alone determine if it was grounded on substantial evidence. Should Tenwood's position be accepted that a proper determination and declaration of blight occurs simply by adoption of the resolution in question, the entire mechanism for judicial review of municipal action in the blight context would be completely frustrated. The October 24 resolution of the township merely mimics the statutory wording as contained in N.J.S.A. 55:16-18. Nowhere does the resolution suggest that any of the definitional conditions contained in any of the blight laws were even considered or passed on. Nowhere does the resolution intimate reasons for the declaration of blight; nor does it specifically delineate the area of blight.
Tenwood's argument under Cervase v. Kawaida Towers, Inc., supra, that for tax exemption under N.J.S.A. 55:16-18, no specific finding as to a particularly prescribed area need be made concerning blight, runs directly counter to *402 N.J.S.A. 40:55-21.3, which requires the boundaries of such an area to be precisely delineated. That these statutes, the Blighted Areas Act and the Limited Housing Corporations Law are in pari materia means at the least that their respective provisions will not contradict each other. Kawaida, as noted above, is limited to the holding that given the prior existence of a blighted area, the tax exempt project need not specifically be located within it.
Taking all the foregoing arguments and considerations into account, § 18's construction in the last analysis must "turn on the breadth of the objectives of the legislation and the common-sense of the situation." Jersey City Chap. Prop. Owner's &c. Assoc. v. City Council, supra 55 N.J. at 100.
This court finds that N.J.S.A. 55:16-18 requires a municipality to undertake a comprehensive investigation, which includes public hearings, before it may legally declare a condition of blight or grant tax exempt status to a private corporation. A municipal resolution falling short of the statutory procedures in its declaration of blight is ultra vires, and, as in this case, is void and of no effect.
Accordingly, the motion for partial summary judgment of the Committee is granted and the motion for partial summary judgment of Tenwood is denied.